[Civ. No. 20279. First Dist., Div. One. Feb. 28, 1962.]

THE REGENTS OF THE UNIVERSITY OF CALIFOR-
NIA et al., Petitioners, v. THE SUPERIOR COURT OF
THE CITY AND COUNTY OF SAN FRANCISCO,
Respondent; HARRY FISH, Real Party in Interest.

Bledsoe, Smith, Cathcart, Johnson & Phelps and Robert
A. Seligson for Petitioners.

No appearance for Respondent.

Hersh & Hadfield for Real Party in Interest.

. TOBRINER, J.— We have concluded, for the reasons set forth *infra*, that the personal and family psychiatric history of a plaintiff who sues for unlawful commitment is not remote to the subject matter of such a suit, and it is reasonably calculated to lead to the discovery of admissible testimony; it is accordingly testimony procurable on deposition under section 2016, subdivision (b), of the Code of Civil Procedure.

Petitioners seek a writ of mandate commanding respondent superior court to grant their motion for an order to compel answers to questions propounded to real party in interest (plaintiff) at his deposition. In an action pending in the City and County of San Francisco plaintiff has charged petitioners with liability for false arrest, imprisonment and malicious prosecution, alleging that on February 5, 1959, petitioners without reasonable cause, caused him to be unlawfully arrested and imprisoned in the psychopathic detention ward within San Francisco General Hospital and that plaintiff was thereafter forcibly detained until released, pursuant to court order, on February 10, 1959.

As a second cause of action the complaint sets forth that on February 9, 1959, petitioners maliciously and without probable cause, filed a petition in the superior court pursuant to section 5047 of the Welfare and Institutions Code; that petitioners alleged that "plaintiff was believed to be mentally ill and in need of supervision, care or treatment"; that thereafter, pursuant to said petition, the superior court ordered plaintiff to be detained and examined and "plaintiff was detained in the psychopathic ward of the San Francisco General Hospital"; that the superior court on February 10, 1959, directed that plaintiff be discharged from detention.

Pursuant to notice, petitioners took plaintiff's deposition, and, in the course of the deposition, plaintiff, on advice of counsel, refused to answer certain questions pertaining to matters which we set out *infra*. The court denied petitioners' motion for an order to compel answers to these queries. The questions pertained to the following subject matters:

1. Questions concerning plaintiff's failure to file income tax returns for 1959 and 1960.

2. Questions concerning prior psychiatric care, consultation and hospitalization.

3. Questions as to whether or not anyone in plaintiff's family had ever been in a mental institution.

4. Questions concerning plaintiff's prior defamation suit.

We shall determine the propriety of petitioners' procedure to bring the matter before us, then identify the precise issue involved, and finally analyze separately the validity of petitioners' application for our intervention in each of the four areas of questioning set forth above.

■ The procedure of mandate constitutes a proper method for obtaining relief in the circumstance of a discovery procedure. No appeal lies from an order denying such discovery. "[S]ince review on appeal from such final order or judgment as may be made in the proceeding in which the discovery is sought would be an inadequate remedy, mandate is a necessary and proper method of obtaining relief. . . ." (*Carlson* v. *Superior Court* (1961) 56 Cal.2d 431, 435-436 [15 Cal.Rptr. 132, 364 P.2d 308].) If then, petitioners have invoked the proper procedure, we turn to the substantive issue they have thereby presented.

The test to be applied to the resolution of the precise issue involved lies in section 2016, subdivision (b), of the Code of Civil Procedure and in the exhaustive opinions in *Greyhound Corp.* v. *Superior Court* (1961) 56 Cal.2d 355 [12 Cal.Rptr. 90, 364 P.2d 266] and the accompanying cases. The cited section provides: "(b) Unless otherwise ordered by the court as provided by subdivision (b) or (d) of section 2019 of this code, the deponent may be examined regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action. . . . It is not ground for objection that the testimony will be inadmissible at the trial if the testimony sought appears reasonably calculated to lead to the discovery of admissible evidence. All matters which are privileged against disclosure upon the trial under the law of this State are privileged against disclosure through any discovery procedure."

*Greyhound* tells us that we must determine whether petitioners' questions pertained to matters which were "relevant to the *subject matter* involved in the pending action" (p. 390) and whether "'the testimony sought appears reasonably calculated to lead to the discovery of admissible evidence'" (p. 391); that, in so doing, we must construe

the statute "liberally in favor of disclosure unless the request is clearly improper. . . ." (*Greyhound Corp.* v. *Superior Court, supra*, 56 Cal.2d 355, 377.)

The liberal breadth of such construction finds no limitation here in two possible narrowing limitations. First, although plaintiff could have moved to limit the taking of the deposition pursuant to Code of Civil Procedure section 2019, subdivision (b), or (d), he did not do so; we therefore do not proceed under those cited sections but under the general aegis of Code of Civil Procedure section 2034, subdivision (a). Second, the form of the motion does not confine us to the restricted ground of whether petitioners' questions related only to the *issues* of the litigation instead of to the wider ground of its subject matter. It is true that the motion asserted "that such questions are relevant to the issues herein" only, and the trial court then would have been justified in deciding the motion exclusively upon the specific grounds proffered. (*Taliaferro* v. *Riddle* (1959) 167 Cal.App.2d 567, 570 [334 P.2d 950]; *Castagnoli* v. *Castagnoli* (1954) 124 Cal. App.2d 39, 41 [268 P.2d 37].) Petitioners, however, went further: they urged that the answers "should be required for the purpose of discovery. . . ." Nor does plaintiff urge this point as to the possible narrow view of the motion; plaintiff and petitioners apparently concur in plaintiff's statement in his memorandum: "The question, therefore, to be determined in this matter is whether the information sought to be elicited from real party in interest was, in fact, relevant to the subject matter of the pending action, and not otherwise privileged."

We turn to each category of questions:

1. *Questions concerning plaintiff's failure to file income tax returns for 1959 and 1960.*

While plaintiff testified that he did not file any income tax returns for 1959 and 1960, he refused to answer the question, "What was the reason for your not filing any income tax return for 1959 and '60?" Although plaintiff now claims that his testimony as to his reason for his failure to file the tax return constituted a privileged matter, we believe that, in the first place, plaintiff cannot properly claim such privilege in a state court, and, second, assuming the privilege were available to him, he has waived it.

Plaintiff apparently predicates the privilege upon the possible violation of the federal statute, since he states that

"[f]ailure to file an income tax return . . . is of no criminal consequence unless the income of the party failing to so file is over $600.00 per year." The California statute, of course, requires a return only if the income of a single person reaches $1,500 per year (Rev. & Tax. Code, § 18401); the federal income tax return for the single person must be filed if his income exceeds $600 (U.S. Int. Rev. Code, § 6012).

"The United States Supreme Court in *Knapp* v. *Schweitzer* (1958) 357 U.S. 371 [78 S.Ct. 1302, 2 L.Ed.2d 1393] held that a witness who secures immunity from the state against state prosecution cannot successfully assert in a state proceeding the privilege against self-incrimination on the ground that his testimony would subject him to federal prosecution. Mr. Justice Frankfurter, speaking for the court, said: "In construing the Fifth Amendment and its privilege against self-incrimination, one must keep in mind its essential quality as a restraint upon compulsion of testimony by the newly organized Federal Government at which the Bill of Rights was directed, and not as a general declaration of policy against compelling testimony. It is plain that the amendment can no more be thought of as restricting action by the States than as restricting the conduct of private citizens. The sole— although deeply valuable—purpose of the Fifth Amendment privilege against self-incrimination is the security of the individual against the exertion of the power of the Federal Government to compel incriminating testimony with a view to enabling that same Government to convict a man out of his own mouth." (Pp. 379-380.) As Witkin points out, "This principle has been applied: . . . (2) To deny a claim of privilege in a state court, where the danger is only of prosecution in another state or under federal law." (Witkin, Cal. Evidence, § 468, pp. 521, 522. See *Jack* v. *Kansas* (1905) 199 U.S. 372 [26 S.Ct. 73, 50 L.Ed. 234]; Wigmore on Evidence, § 2258, pp. 342, 345.)

Even assuming, however, that the privilege against federal prosecution could be invoked in the state court, we believe plaintiff has waived it in the present case by voluntarily disclosing part of the subject matter. Since the witness testified that he did not file any income tax returns for 1959 and 1960 he waived the privilege as to answering the question regarding his reason for not so filing.

As Wigmore states: "(1) The witness who is not the accused in a criminal trial—the *ordinary witness*—may waive

his privilege; this is conceded. He waives it by exercising his option of answering; this is conceded. Thus the only inquiry can be whether, by *answering as to fact X, he waived it for fact Y.* The answer is yes, provided the facts are sufficiently related. The clear case is that in which fact Y is but a detail implying no further self-incrimination—none in addition to that already volunteered by the disclosure of fact X. A more difficult case is that in which facts X and Y are interdependent parts of a whole fact forming a single relevant topic. If it is patent at the time of the disclosure of fact X that any distortion caused by that disclosure can be discovered and corrected only by the acquisition of information as to fact Y, then it is reasonable to hold that the witness' voluntary disclosure of part is a waiver as to the related parts." (Wigmore on Evidence, § 2276, p. 456.)

The so-called "distortion" created by the nonfiling of the tax returns, if it created any criminal liability on the part of plaintiff at all, could be "corrected only by the acquisition" of information as to his reasons for not filing; it is therefore reasonable to hold, in the words of Wigmore, that the "voluntary disclosure of part is a waiver as to the related parts." (P. 456.) The principle thus expressed finds illustration in *People* v. *Freshour* (1880) 55 Cal. 375, wherein the court states: "The scheme of the parties, and the acts following, were parts of one transaction, and when a witness voluntarily testifies in chief on a particular subject, he may be cross-examined on that subject, even though his answers may criminate or disgrace him." (P. 376.) (See *Rogers* v. *United States* (1951) 340 U.S. 367 [71 S.Ct. 438, 95 L.Ed. 344, 19 A.L.R.2d 378]; *Brown* v. *United States* (1958) 356 U.S. 148 [78 S.Ct. 622, 72 A.L.R.2d 818].)

We conclude that plaintiff's reliance on the privilege fails on either or both of the above grounds.

2. *Questions concerning prior psychiatric care, consultation and hospitalization.*

The sought information as to prior psychiatric care is procurable if it would itself have constituted admissible evidence, or if it were relevant to the subject matter, or if it were reasonably calculated to lead to the discovery of admissible evidence. Even if the answers to the proposed questions might not meet the more restrictive test of admissibility, we entertain no doubt that they would at least be relevant to the

subject matter and calculably lead to the discovery of admissible evidence.

The crucial issue of the case will turn upon whether or not petitioners acted with reasonable cause in committing plaintiff. Plaintiff argues that the reasonable cause must be pinpointed to the conduct of plaintiff on the day of commitment. Did he then act in such a manner as to furnish the basis for commitment required by the statutes? Section 5050.3 of the Welfare and Institutions Code establishes the following test. "When any person becomes so mentally ill as to be likely to cause injury to himself or others and to require immediate care, treatment, or restraint, a peace officer, health officer, *county physician or assistant county physician*, who has *reasonable cause* to believe that such is the case, may take the person into custody for his best interest and protection and place him as provided in this section." (Emphasis partly added.) Likewise, section 5047 of that code provides that the propriety of filing a petition for commitment rests upon probable cause.

Plaintiff's prior psychiatric history could cast light upon his conduct at the time of his commitment. If petitioners testified that plaintiff's action at that time was suspicious or peculiar, and plaintiff denied such action or its connotations, a previous history of emotional difficulty would lend support to petitioners' position. As an example, while expressions of deep depression may be considered nothing more than the greyness of a passing mood in a normal person, they take on quite another and more ominous coloration in one who has had a history of manic-depression. The uncertainty and doubt of strange behavior may well be resolved by the past psychotic history of the patient. The fact of plaintiff's emotional or psychotic upset of the day before the commitment might well support petitioners' conclusion that he was in that continuing condition on the day of the commitment. Surely the shadows of yesterday's emotional state fall across the threshold of today. (2 Wigmore on Evidence, § 233, p. 25; *Lyon* v. *Hancock* (1868) 35 Cal. 372; 32 Cal.Jur.2d § 39, pp. 101, 104.)[1]

[1]The standard work of Noyes and Kolb, Modern Clinical Psychiatry, states: "Since, in his study of the patient the psychiatrist *seeks to understand the present in terms of the past*, the psychiatric history is of much importance. In securing it one attempts to ascertain what environmental, social, emotional and other psychological influences and experiences influenced the patient's personality development. The behavior of the individual, whether normal or abnormal, will reveal re-.

Even if the desired information should not itself qualify as admissible evidence regarding the important question of plaintiff's conduct on the day of commitment, the sought facts would appear to be "reasonably calculated to lead to the discovery of admissible evidence." (Code Civ. Proc., § 2016, subd. (b); McCormick on Evidence, § 162, p. 340.) In view of the Supreme Court's wide latitude as to disclosure by discovery (*Greyhound Corp.* v. *Superior Court, supra,* 56 Cal.2d 355; *Chronicle Pub. Co.* v. *Superior Court* (1960) 54 Cal.2d 548 [354 P.2d 637]) we cannot say now that such information might not reasonably lead to prospective admissible evidence. Of course, prior to trial, we cannot exactly define relevant evidence; as one court has said as to such a determination even at trial, " 'No precise or universal test of relevancy is furnished by the law. The question must be determined in each case according to the teachings of reason and judicial experience.' . . ." (*Moody* v. *Peirano* (1906) 4 Cal.App. 411, 418 [88 P. 380]; Witkin, Cal. Evidence, § 113, p. 135.) Yet a rigid predetermination of the admissibility of the sought testimony or of the probabilities of the inquiring party's questions leading to relevant evidence should not work to block his endeavors if the desired testimony seems "reasonably calculated" to lead to relevant evidence. (Code Civ. Proc., § 2016, subd. (b).)

Plaintiff's contentions that petitioners must fail because the requested information is not relevant to the *issue* of whether or not petitioners acted with probable cause founders upon the *Greyhound* ruling that the test is the relevancy of the questions, not to the issues, but to the *subject matter.* Indeed, even if the answers to the questions might not be admissible they might reasonably lead to evidence indicating whether or not petitioners acted with probable cause.

Plaintiff's further argument that "[b]y way of answer, petitioners cite three sections of the above Code" (Welf. & Inst. Code, §§ 5750.3, 6002 and 6005), and plaintiff's contention that such sections are irrelevant, is not pertinent to the present issue. Plaintiff, himself, points out that the issue turns upon whether "[i]n doing the things alleged in the complaint, petitioners did so without 'reasonable cause' and with-

curring patterns, perhaps partly determined by constitution, but more by life experience built into the personality. The psychiatric history will therefore be not merely a history of the patient's symptoms but a searching biography, a psychobiological life chart." (P. 132; emphasis added.)

out 'probable cause.' '' Since we have reviewed the case on the basis of whether or not the proposed questions would relate to the issue as stated by plaintiff, we need not examine the exact effect of the cited sections; we have resolved the problem on the basis of the proffered issue, and the propounded questions become important only in that frame of reference.

3. *Questions as to whether or not anyone in plaintiff's family had ever been in a mental institution.*

For the reasons set forth under category two above, the question as to whether anyone in plaintiff's family had ever been hospitalized in a mental institution became relevant to the subject matter of the suit and reasonably calculated to lead to the discovery of admissible evidence. The decision whether petitioners made their determination of commitment based upon reasonable cause does not issue from a sure mathematical computation but from a host of imponderables. Certainly, however, the reasonableness of petitioners' actions would be confirmed, at least in certain areas of mental disorder, by proof of familial schizophrenia or manic-depressive insanity. Authoritative medical opinion states that there is a strong showing of a hereditary basis for these diseases.[2] To

[2]Noyes and Kolb, Modern Clinical Psychiatry, states: ''[S]chizophrenia occurs much more frequently in families which include a known case of schizophrenia than it does in the general population. [He found also] that the average expectancy in any group of persons who are not characterized by blood relationship to a schizophrenia case is 0.85 per cent but that the children of one schizophrenia parent have a probability of developing the disease which is 19 times that of the general population. . . . [T]he morbidity rate among the children of two schizophrenic parents is about 80 times the average expectancy, and that among uniovular twins of such parents the expectancy rate is 85.8 per cent. [He does not mean] that a person is 'born' a manic-depressive or a schizophrenic, rather that one inherits a specific capacity for reacting to personality stresses with either a manic-depressive or a schizophrenic psychosis while others do not. . . . [H]ealth and adequate adjustment are fundamental biological properties, with hereditary potentiality as the common denominator.'' (P. 68.) Stern, Principles of Human Genetics, states as to schizophrenia and manic-depressive: ''The probabilities of being schizophrenic or becoming affected with schizophrenia, which are listed in the table, are not based on knowledge of the specific type of inheritance of the disease but simply on its observed frequency in the different groups of relatives of affected propositi. . . . The very much higher incidence of schizophrenia among the relatives of affected persons than in the general population is most impressive. Among the adult children of patients, for instance, the incidence is nearly twenty times higher than in general. In addition to schizophrenia itself, the frequency of similar, less serious, mental ab-

determine if the behavior of plaintiff upon commitment, which may well be in dispute at the trial, was or was not of such a nature as to justify the petitioners' decision, the hospitalization of a member of plaintiff's family in a mental institution would be relevant to the subject matter.

4. *Questions concerning plaintiff's prior defamation suit.*

Although petitioners queried plaintiff as to a defamation suit which he previously filed, and plaintiff originally refused to answer this query, plaintiff at oral argument withdrew his objection to that question and conceded the point. We therefore find it unnecessary to discuss the issue here.

In summary, plaintiff properly concludes his memorandum with the observation that "[d]iscovery is not synonymous with inquisition." Yet plaintiff, who brings suit for high damages for an alleged unlawful commitment should not object to furnishing information on reasonably related matters, such as his own psychiatric history or the hospitalization of a member of his family in a mental institution. Such questions lead to relevant information; they do not subject plaintiff to punitive inquisition.

It is therefore ordered that a peremptory writ of mandate issue requiring the trial court to vacate its order denying petitioners' motion to compel plaintiff to answer certain questions propounded at the deposition taken on February 27, 1961, and to grant said motion and to order the discovery prayed for therein.

: Bray, P. J., and Sullivan, J., concurred.

---

normalities is also greatly increased. Elaborate statistical analyses of data on schizophrenia have suggested recessive inheritance, and some authors are inclined to the hypothesis that a single gene difference is involved. In addition, the twin data indicate a considerable degree of incomplete penetrance. . . . Another frequent type of mental disease is *manic-depressive insanity* with an incidence in the general population of somewhat less than one-half percent. The disease is often characterized by alternating emotional stages of exaggerated exaltation and depression. Empirical data on its incidence in relatives suggest inheritance with dominance involved, but no definite knowledge of the genetic details is available. Twin data again show a strikingly higher concordance with identical as opposed to nonidentical genotypes." (Pp. 487-489.) (See also: Ziskind, Psychophysiologic Medicine, pp. 31-32.)