[Civ. No. 33884. Second Dist., Div. Five. Mar. 12, 1969.]

VICTOR G. ZONVER et al., Petitioners, v. THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent; VIVIAN ZONVER, Real Party in Interest.

McGurrin & Denny and George V. Denny III for Petitioners.

No appearance for Respondent.

Joseph W. Fairfield, Ethelyn F. Black and Alfred W. Omansky for Real Party in Interest.

KAUS, P. J.—In this divorce matter we granted an alternative writ of prohibition in order to permit us to explore the

question of the extent to which a claim of self-incrimination, asserted by the husband and his female bookeeper, prevents inquiry into their social and sexual relationship.

The wife's complaint was filed August 27, 1968. It alleged cruelty in the usual form. No correspondent was named. On September 19 the wife served close to one hundred interrogatories on the husband. Three of them read as follows: "75. State the residence, address and telephone number of Ann Jacobs. 76. State in detail the times you have visited with Ann Jacobs at her home within the past two years. 77. If Ann Jacob's residence was not the same at all times within the past two years, state each and every address where you visited her."

On October 11 the husband served and filed answers to the interrogatories. With respect to numbers 75, 76 and 77 he objected as follows: "Refuse to answer on grounds that any answer might tend to incriminate me."

On October 7 the wife took the deposition of Ann Jacobs. With reference to the husband, Mrs. Jacobs was asked the following: "Have you gone out with him socially?" and "Is any of Mr. Zonver's clothing at your home on Fair Avenue?" On the advice of counsel she refused to answer on the ground of self-incrimination. On October 25 the superior court ruled that interrogatories 75, 76 and 77 had to be answered by the husband "except that he need not set forth any information as to any visits with Ann Jacobs that occurred outside the State of California." On October 31 the court ruled that Mrs. Jacobs had to answer "all questions concerning her social relationship with the defendant, Victor Zonver, insofar as they relate to activities within the State of California."

On October 28 the wife served a request for admission on the husband. He was asked to admit that he had had sexual intercourse with Ann Jacobs on 40 specified dates between January 20 and September 22, 1968. He was also asked to admit that he had had intercourse with Mrs. Jacobs on dates other than those specifically mentioned and that there had been intercourse in various hotels and motels in Las Vegas, Reno and Lake Tahoe, Nevada. The record before us shows no superior court ruling as far as the request for admissions is concerned.

■ Although California has always had a prohibition against self-incrimination in its Constitution (Cal. Const., art. I, § 13) it was not until *Malloy* v. *Hogan,* 378 U.S. 1 [12 L.Ed.

2d 653, 84 S.Ct. 1489], was decided on June 15, 1964, that our state became compelled to enforce the prohibition against self-incrimination contained in the Fifth Amendment to the United States Constitution. One effect of *Malloy* was to make prior California cases refusing to apply the privilege against self-incrimination suspect since they had not necessarily applied federal standards. (*Griffin* v. *California,* 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229].) It will therefore be helpful to the present inquiry to set forth the precise facts of *Malloy.*

In 1959 Malloy had been arrested, in Connecticut, in a gambling raid. He pleaded guilty to pool selling. He served 90 days in jail and was placed on probation for two years. Sixteen months after his plea he refused to answer, on the ground of self-incrimination, certain questions in an official inquiry into alleged gambling and other criminal activities. The Supreme Court summarized the questions which he refused to answer as follows: ". . . (1) for whom did he work on September 11, 1959; (2) who selected and paid his counsel in connection with his arrest on that date and subsequent conviction; (3) who selected and paid his bondsman; (4) who paid his fine; (5) what was the name of the tenant of the apartment in which he was arrested; and (6) did he know John Bergoti. . . ." (378 U.S. at p. 12 [12 L.Ed.2d at p. 662].) After holding that the Fifth Amendment applied to the states, the Supreme Court had little trouble finding that Malloy had properly sought to exercise his privilege: ". . . The interrogation was part of a wide-ranging inquiry into crime, including gambling, in Hartford. It was admitted on behalf of the state at oral argument—and indeed it is obvious from the questions themselves—that the state desired to elicit from the petitioner the identity of the person who ran the pool-selling operation in connection with which he had been arrested in 1959. It was apparent that petitioner might apprehend that if this person were still engaged in unlawful activity, disclosure of his name might furnish a link in a chain of evidence sufficient to connect the petitioner with a more recent crime for which he might still be prosecuted.

"Analysis of the sixth question, concerning whether petitioner knew John Bergoti, yields a similar conclusion. In the context of the inquiry, it should have been apparent to the referee that Bergoti was suspected by the State to be involved in some way in the subject matter of the investigation. *An affirmative answer to the question . . . might well have either connected petitioner with a more recent crime, or at least have*

*operated as a waiver of his privilege with reference to his relationship with a possible criminal.* See *Rogers* v. *United States,* 340 U.S. 367, 95 L.Ed. 344, 71 S.Ct. 438, 19 A.L.R.2d 378. We conclude, therefore, that as to each of the questions, it was 'evident from the implications of the question, in the setting in which it [was] asked, that a responsive answer to the question or an explanation of why it [could not] be answered might be dangerous because injurious disclosure would result,' *Hoffman* v. *United States,* 341 U.S., at 486-487, 95 L.Ed., at 1124 [71 S.Ct. 814]; see *Singleton* v. *United States,* 343 U.S. 944, 96 L.Ed. 1349, 72 S.Ct. 1041." (378 U.S. at pp. 13-14 [12 L.Ed.2d at pp. 662-663]. Italics added.)

The significance of the holding is best understood by a reading of Justice White's dissent. Justice White is not in disagreement with the proposition that the Fifth Amendment applies to the states. He does disagree, however, with its application in *Malloy.* He points out that at the time the questions were asked the statute of limitations had barred any further prosecution for violations of the state pool selling statute in 1959. Besides, the Connecticut court had been unable to find any other state statute which Malloy's gambling activities in 1959 could have violated: ". . . Beyond this Malloy declined to offer any explanation or hint at how the answers sought could have incriminated him. In these circumstances it is wholly speculative to find that the questions about others, not Malloy, posed a substantial hazard of criminal prosecution to Malloy. Theoretically, under some unknown but perhaps possible conditions any fact is potentially incriminating. But if this be the rule, there obviously is no reason for the judge, rather than the witness, to pass on the claim of privilege. The privilege becomes a general one against answering distasteful questions." (378 U.S. at p. 37 [12 L.Ed.2d at p. 676].) Nor does Justice White agree with the reasoning of the court to the effect that by answering the questions Malloy might furnish a link in a chain of evidence against himself, if his former associates were still engaged in illegal activity. He points to the fact that this is a wholly speculative assumption, not supported by the record.

Whether or not *Malloy* went too far is, of course, beside the point. We must apply it, as best we can, to our specific problem.

The Penal Code of our state covers many aspects of sexual activity. (*In re Lane,* 58 Cal.2d 99, 103 [22 Cal.Rptr. 857, 372 P.2d 897].) ▬ The mere fact that adultery not carried

to the point of cohabitation (Pen. Code, §§ 269a, 269b), is not in itself a crime, does not mean that evidence thereof cannot be a strong link in a chain of evidence proving a defendant guilty of a variety of misdemeanors and felonies. (*Blau* v. *United States*, 340 U.S. 159 [95 L.Ed. 170, 71 S.Ct. 223]; *In re Leavitt*, 174 Cal.App.2d 535 [345 P.2d 75]; *Cohen* v. *Superior Court*, 173 Cal.App.2d 61, 68 [343 P.2d 286].)

Apparently the trial court felt that by upholding the claim of privilege with respect to activities outside of the State of California, Mr. Zonver's privilege in connection with any possible prosecution under the Mann Act (18 U.S.C. § 2421) was adequately protected. This is emphatically wrong.[1] In a number of cases, one of the more recent of which is *Head* v. *United States*, 346 F.2d 194, evidence of immoral conduct not directly related to any interstate transportation has been held admissible to illuminate the purpose of the transportation. In the *Head* case the transportation involved was from Oregon to Washington. Evidence was admitted that three days before the act of transportation the defendant had propositioned the woman in question in a motel in Salt Lake City, Utah. Affirming, the court said: ''The testimony in question concerning the Salt Lake City incident, is relevant to the charge, and to the consistent theory of the Government's case, that Head transported the three women for the purpose of debauchery and other immoral purposes, as well as for the purpose of prostitution. It is relevant because it tends to show that, having had this one experience with the woman in question, one of his purposes in later transporting her from Portland to Seattle was to have additional experiences of this kind. As the trial court correctly instructed the jury, without objection, it was not necessary for the Government to prove that such a purpose was accomplished.'' (346 F.2d at p. 197. Cf. *Bayless* v. *United States*, 365 F.2d 694, 696; *Patterson* v. *United States*, 361 F.2d 632, 636; *United States* v. *Ratley*, 284 F.2d 553, 554; *Whitt* v. *United States*, 261 F.2d 907, 908; *Daigle* v. *United States*, 181 F.2d 311, 312.)

Quite apart, however, from self-incrimination under

---

[1]The trial court was, of course, correct in assuming that a claim of self-incrimination under federal law was cognizable in this state proceeding. (*Murphy* v. *Waterfront Com.*, 378 U.S. 52 [12 L.Ed.2d 678, 84 S.Ct. 1594], overruling *Feldman* v. *United States*, 322 U.S. 487 [88 L.Ed. 1408, 64 S.Ct. 1082, 154 A.L.R. 982].) For a recent annotation analyzing cases involving interstate transportation for immoral purposes, but not involving commercial vice see 23 A.L.R.3d 423. It will be noted that some of the cases there discussed involve relatively recent prosecutions.

the Mann Act, we believe that the phalanx of state statutes in the field of sex provides ample justification for the exercise of the privilege in this case. ■ We are aware that, Justice White's dissent in *Malloy* notwithstanding, a witness' say-so does not automatically excuse him from answering a question he does not want to answer. ''. . . It is for the court to say whether his silence is justified, [Citation] and to require him to answer if 'it clearly appears to the court that he is mistaken.' [Citation.] However, if the witness, upon interposing his claim, were required to prove the hazard in the sense in which a claim is usually required to be established in court, he would be compelled to surrender the very protection which the privilege is designed to guarantee. . . .'' (*Hoffman* v. *United States*, 341 U.S. 479, 486 [95 L.Ed. 1118, 1123, 71 S.Ct. 814].)

■ *Hoffman* and *Malloy* tell us to look to the setting in which the questions are asked. (See also *Cohen* v. *Superior Court*, 173 Cal.App.2d 61, 71 [343 P.2d 286].) In the case at bar it is quite clear that Mrs. Zonver did not want to know where Mrs. Jacobs lived in order to send her a Christmas card. Nor did she inquire of Mrs. Jacobs into dates with Mr. Zonver and the whereabouts of the latter's clothing out of a solicitude for her husband's social life or wifely worries over his wardrobe. Her counsel candidly admitted to the superior court: ''The preliminary questions, of course, were innocuous and unquestionably they would tend to lead to more information regarding Mrs. Jacobs' sexual relationships with the defendant.'' As the later request for admissions proves, the statement was entirely correct.

Nor does Mrs. Zonver appear to be a wife who suffers her husband's suspected infidelities in tolerant resignation. She is on the warpath. It is immaterial that, as her counsel points out, she feels she has reason to be angry.[2] Mrs. Zonver has hired detectives. She has filed two other actions against her husband. The superior court file in the case at bar indicates from a surfeit of filings by both sides that they, at least for the time being, are not parting as friends. Fear that Mrs. Zonver may try to enlist the processes of the criminal law to help her get what she wants or to satisfy her vengeance is neither speculative nor paranoid.

Possible state, as well as federal, self-incrimination is there-

_____

[2] At her deposition she claimed that for three years Mr. Zonver had failed to sleep at home more than two nights per week, but that when he did come home, he brought along ''a week's dirty laundry with women's underclothes . . .''

fore at least as realistic here as it was in *Malloy*. Petitioners do not have to explain in prurient detail just how, under what subsection of what statute, answers about their social relationship can get them into trouble. ''The witness does not have to demonstrate conclusively that the answers to the questions will make him subject to prosecution nor need he demonstrate that he likely would be convicted.'' (*Cohen* v. *Superior Court, supra,* 173 Cal.App.2d at p. 68.) Once the point is reached where reasonable judicial imagination can take over, the witness may remain silent.

 Leaving aside some of the more exotic sex crimes listed by petitioners, it seems quite plain that what justifies their claim of privilege is fear that to answer questions concerning their relationship may provide a link in prosecutions for violations of section 288a of the Penal Code with respect to both petitioners, or of adulterous cohabitation (Pen. Code, § 269a) with respect to Mr. Zonver.[3] Given the setting in which the questions are asked, particularly as illuminated by the request for admissions, to ask for more information would be to require that a constitutional right be waived before it may be asserted.[4]

Petitioners also assert that if they answer the questions heretofore propounded to them, they may later be held to have waived their privilege. It will be recalled that in *Malloy* the claim of privilege with respect to the sixth question was upheld for alternate reasons: that an answer to the question

---

[3]Mrs. Zonver relied chiefly on *San Chez* v. *Superior Court*, 153 Cal. App. 2d 162, 165 [314 P.2d 135]. In that case it was held that a defendant-husband in a separate maintenance action had to answer questions concerning his adulterous conduct because ''adultery *per se* is not a public offense.'' In the light of *Malloy*, *San Chez* cannot be considered good law.

[4]It may be thought that we go too far with respect to interrogatory 75 which asks for the residence, address and telephone number of Mrs. Jacobs. Normally it would probably be true that such a question, addressed to the employer of the woman in question, can hardly be incriminating. His ability to respond to a written interrogatory shows no guilty knowledge as he can obtain the information from a glance at his personnel records and, unless the employee is hiding, the furnishing of the information would add nothing to what anyone can discover from public records. In the case at bar, however, we have this interesting situation: at her October 7 deposition Mrs. Jacobs did testify to a certain address, a private home which she claims to own but which is in her mother's name. Nevertheless Mr. Zonver continues to refuse to answer interrogatory 75 and Mrs. Zonver—apparently not satisfied with the answer by Mrs. Jacobs—continues to press the question. If we misunderstand the position of the parties and they really are not fighting about interrogatory 75, no harm is done if Mr. Zonver is not required to answer it. If, on the other hand, there is more to this situation than meets the eye, it is entirely proper that he should claim the privilege.

might connect Malloy with a recent crime or, at least, operate as a waiver of the privilege with reference to his relationship with a possible criminal. (378 U.S. at p. 14 [12 L.Ed.2d at p. 663].) The use of the words "at least" strongly implies that a waiver of the privilege may be found in the voluntary answer to a question which, in itself, would not connect the witness with a crime. Since, in our opinion, petitioners legitimately claimed the privilege on the first of the two alternatives, it is unnecessary for us to view their problem from the point of view of a possible waiver with respect to additional questions which come closer to the activities they do not want to talk about.[5]

Mrs. Zonver, the real party in interest, claimed below and continues to claim in this court that Mr. Zonver waived the privilege with respect to the interrogatories by filing his objections a few days late. (Code Civ. Proc., § 2030, subd. (a).) Before the matter of the objections came on for hearing before the trial court, counsel for Mr. Zonver filed a declaration stating facts which, in the trial court's discretion, could be considered a basis for relieving him of any default. In *Coy* v. *Superior Court,* 58 Cal.2d 210, 216 [23 Cal.Rptr. 393, 373 P.2d 457, 9 A.L.R.3d 678] and *West Pico Furniture Co.* v. *Superior Court,* 56 Cal.2d 407, 414 [15 Cal.Rptr. 119, 364 P.2d 295] it was recognized that tardiness in objecting may be excused by "a showing of good cause for relief from de-

---

[5]In this connection we must respectfully question *In re Leavitt,* 174 Cal.App.2d 535, 538-539 [345 P.2d 75], if read to hold that a witness may arbitrarily refuse to answer incriminating questions, after testifying freely on the subject matter to which the incriminating question relates. That appears to be the rule in England. (8 Wigmore, Evidence (McNaughton rev. 1961) § 2276, p. 469.) *Regents of University of California* v. *Superior Court,* 200 Cal.App.2d 787, 791-792 [19 Cal.Rptr. 568], relying on *People* v. *Freshour,* 55 Cal. 375, 376, is irreconcilable with *Leavitt.* See also *Brown* v. *United States,* 356 U.S. 148 [2 L.Ed.2d 589, 78 S.Ct. 622, 72 A.L.R.2d 818] and *Rogers* v. *United States,* 340 U.S. 367 [95 L.Ed. 344, 71 S.Ct. 438, 19 A.L.R.2d 378]. The elusive concept of waiver is discussed in an interesting comment: *Waiver of the Privilege Against Self Incrimination,* 14 Stanford Law Review 811. Its author points out that a broad rule of waiver demands an early assertion of the privilege: ". . . Obviously if apparently innocuous testimony may operate to waive the privilege as to all of the potentially incriminating details which might be brought out in cross-examination, then, unless we are to hold that a witness may waive his privilege before he had a right to invoke it, the scope of permissible invocation must be correspondingly expanded. The witness must be permitted to remain silent, despite the fact that his immediate answer would do him no harm as long as the transaction to which it relates, if fully disclosed in all its details, might prove incriminating. By this test the witness is obliged to predict the incriminating effect of remote incidents of the fact upon which he is questioned. . . ." (14 Stan.L.Rev. at 817, fn. 23.)

fault.'' While it would be better practice to grant such relief by an express order, it is obvious that by considering the claim of self-incrimination on the merits and by sustaining it in part, the court impliedly excused the default.[6]

With respect to Mrs. Jacobs only, the point is made that after she had claimed her Fifth Amendment privilege at her deposition, but before the hearing of October 31, she filed a declaration to the effect that before she refused to answer the questions at the deposition the conduct proscribed by section 269a of the Penal Code—adulterous cohabitation—had been explained to her and that she had refused to answer the questions with that explanation in mind. She adds: ''My belief that such questions and the answers thereto might tend to incriminate me is further bolstered by the admission of Mrs. Zonver that she has paid approximately $350.00 to private detectives to spy on her husband. This fact coupled with her allegations that her husband has been living with me during the past several years, makes it apparent that any question the answer to which would tend to establish motive, desire, or opportunity to engage in the conduct proscribed in Penal Code Section 269 (a) [*sic*] would tend to incriminate me.''

Mrs. Zonver reads this declaration as an abandonment of any claim of self-incrimination except with respect to section 269a and correctly points out that this is one sex crime of which Mrs. Jacobs, a divorcee, cannot be guilty. (*In re Cooper,* 162 Cal. 81, 85-86 [121 P. 318].)

Although it is possible to read the quoted portion of the declaration as meaning that evidence tending to establish motive, desire or opportunity to engage in the conduct proscribed by section 269a would tend to incriminate Mrs. Jacobs in other respects as well, we need not rest our holding that the declaration is of no effect on what may be a strained reading. We must keep in mind that, if we are right so far, the declaration was but an explanation of the reason for Mrs. Jacobs' claim which she was not bound to give. Further, what Mrs. Zonver claims is nothing less than that the privilege broadly and properly asserted at the time of the deposition—a constitutional right which ''reflects many of our fundamental values and most noble aspirations'' (*Murphy* v. *Waterfront Com.,* 378 U.S. 52, 55 [12 L.Ed.2d 678, 681, 84 S.Ct. 1594]),

---

[6]We assume without deciding that the time limits of section 2030 subdivision (a) of the Code of Civil Procedure are applicable even if objections are based on constitutional grounds.

was impliedly waived by a declaration which purported to do no such thing expressly. The Supreme Court's views of waiver of constitutional rights by implication (*Emspak* v. *United States,* 349 U.S 190, 198 [99 L.Ed. 997, 1005, 75 S.Ct. 687] ; *Smith* v. *United States,* 337 U.S. 137, 150 [93 L.Ed. 1264, 1273, 69 S.Ct. 1000] ; cf. *Miranda* v. *Arizona,* 384 U.S. 436, 475 [16 L.Ed.2d 694, 724, 86 S.Ct. 1602, 10 A.L.R.3d 974]), give little encouragement to Mrs. Zonver's position. Moreover it is clear that the trial court did not rely on any supposed waiver. If it had it would not have restricted its order · to questions which related to "activities within the State of California."

*Sheets* v. *Superior Court,* 257 Cal.App.2d 1, 8 [64 Cal.Rptr. 753], cited by Mrs. Zonver, is not in point. In that case we held that where interrogatories were objected to on the narrow ground of the lawyer-client privilege, argument based on the work products rule was not properly before the court. In this case, Mrs. Jacobs asserted her privilege against self-incrimination at the time of the deposition in adequate fashion. We very much doubt that any state rule of procedure which confines her claim to a particular inapplicable penal law, could withstand the mandate of *Henry* v. *Mississippi,* 379 U.S. 443 [13 L.Ed.2d 408, 85 S.Ct. 564], "that a litigant's procedural defaults in state proceedings do not prevent vindication of his federal rights unless the State's insistence on compliance with its procedural rule serves a legitimate state interest." (379 U.S. at p. 447 [13 L.Ed.2d at p. 413] ; cf. *Fay* v. *Noia,* 372 U.S. 391, 438 [9 L.Ed.2d 837, 868-869, 83 S.Ct. 822].) Manifestly no legitimate state interest would be served by restricting Mrs. Jacobs to a narrow, untenable claim in this court, when the trial court obviously believed that her privilege was more broadly asserted and acted on such belief.

█ Leaving aside state considerations, we have no doubt that the liberality with which the Supreme Court considers claims of self-incrimination as having been properly asserted (*Slagle* v. *Ohio,* 366 U.S. 259 [6 L.Ed.2d 277, 81 S.Ct. 1076] ; *Bart* v. *United States,* 349 U.S. 219 [99 L.Ed. 1016, 75 S.Ct. 712] ; *Emspak* v. *United States,* 349 U.S. 190 [99 L.Ed. 997, 75 S.Ct. 687] ; *Quinn* v. *United States,* 349 U.S. 155 [99 L.Ed. 964, 75 S.Ct. 668, 51 A.L.R.2d 1157] ; *Smith* v. *United States,* 337 U.S. 137, 150 [93 L.Ed. 1264, 1273, 69 S.Ct. 1000]), compels us to do the same.

We noted at the outset of this opinion that as far as the

request for admissions is concerned, the trial court has never made a ruling. Since we have no reason to suppose that any future ruling will be inconsistent with this opinion, the peremptory writ is denied without prejudice with respect to the request for admissions.

Let a peremptory writ of prohibition issue restraining the respondent court from enforcing (1) its order of October 25, 1968, requiring the petitioner Zonver to answer interrogatories 75, 76 and 77; and (2) its order of October 31, requiring the petitioner Jacobs to answer questions concerning her social relationship with the petitioner Zonver.

The alternative writ of prohibition heretofore issued is discharged.

Stephens, J., and Aiso, J., concurred.

A petition for a rehearing was denied March 27, 1969, and the petition of the real party in interest for a hearing by the Supreme Court was denied May 8, 1969.