[Crim. No. 19115. Second Dist., Div. Five. Feb. 4, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
JIMMIE LAWRENCE TRAYLOR, Defendant and Appellant.

## COUNSEL

Robert D. Bash for Defendant and Appellant.

Evelle J. Younger, Attorney General, William E. James, Assistant Attorney General, and Robert F. Katz, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**KAUS, P. J.**—Defendant was charged by information with a violation of section 11500.5 of the Health and Safety Code, possession of heroin for sale, and he entered a plea of not guilty. Two prior felonies were alleged and denied by defendant. Trial by jury was waived.

Defendant was found guilty of possession of heroin (Health & Saf.

Code, § 11500), as a lesser and necessarily included offense to the crime charged. Defendant's motions for a new trial and for probation were denied, and he was sentenced to state prison, with a request for diagnostic information and recommendation under section 1168 of the Penal Code. Defendant appeals from the judgment of conviction.

Los Angeles police officers testified as to the circumstances of defendant's arrest. They were on routine patrol when a double parked two-door Cadillac drew their attention. As they drove up behind it, the officers activated the red light on their vehicle and the Cadillac pulled ahead and to the curb. The Cadillac had four people in it, two in front, two in back. The officers then saw defendant emerge from the right side of the car, and the driver from the left. Both began running down the street. They were apprehended by one of the officers.

The other officer found two men in the rear seat of the Cadillac, and, with the aid of a flashlight, a tied red ballon with some contents on the floor in front of the right front seat. A further search turned up a green envelope containing 14 balloons from under the right front seat. All the balloons found contained heroin.

Defendant and Donald Harrison (hereinafter referred to as "the driver") were placed in the police car, evidently under arrest. One of the officers recalled a conversation with defendant which concerned a "bogus" twenty-dollar bill that had been found on his person, and in which defendant said that the car parked in front of the Cadillac was his car.

A small red mark was observed on defendant's inner arm, and his pupils were contracted when he was examined later that evening. One of the officers had seen the mark at the scene of the arrest.

Defendant contended at trial that he had never been a passenger in the Cadillac and did not know the driver. He testified that he was preparing to cross the street at the corner ahead of where the Cadillac was parked, when he saw an officer pursuing the driver along the sidewalk to a point near where he was standing. Both defendant and the driver were taken to where the cars were parked, and after it was determined that defendant was an ex-convict and had a counterfeit twenty-dollar bill in his wallet, he was handcuffed and placed in the police car. Only then was the Cadillac searched and the heroin discovered.

Charges against the driver were dismissed after the preliminary hearing.

## I.

Defendant attempted at his trial to prove his version of the facts by calling the driver to the stand. Defendant asked the witness eight questions, all of which he refused to answer on grounds that the answers might tend

to incriminate him (U.S. Const., Amend. V), unless he were granted immunity from prosecution.[1] He acted on the advice of counsel.

The trial court refused to order the witness to answer the questions, ruling that he had properly invoked his privilege not to answer, in that the answers might tend to incriminate him. Defendant's attorney then took the stand and testified, subject to a motion to strike if the testimony turned out to be inadmissible, to the substance of a conversation he had had with the driver before the noon recess that day.[2]

Defendant argued that this testimony was admissible, though hearsay, as a declaration of the driver against his penal interest. (Evid. Code, § 1230.) The trial court ruled that there was nothing in the statements attributed to the driver which "would subject him to the risk of criminal liability," and granted the People's motion to strike the entire testimony.

██ Defendant on appeal renews his contention at trial that the trial court's findings are inconsistent. He argued that if the answers to the questions put to the driver on the witness stand would tend to incriminate him, the same information testified to by another must be against the driver's penal interest. Conversely, if the statements testified to by defendant's attorney are not against the driver's penal interest, the answers to the ques-

---

[1]The eight questions which the driver refused to answer were:

"1. "[W]as [defendant] in your car on the day and time in question?"

2. "Did Officer Peters discover the contraband that's been marked People's 1-A and 1-B before you were handcuffed and placed in the police unit, if you know?"

3. "What was the total number of people in your vehicle, including yourself, when the police car pulled in behind you?"

4. "[W]ere you present in court and did you hear Officer Peters testify that he observed you exit the vehicle and run towards the corner?"

5. "Where was the defendant when you first observed him that evening?"

6. "Did you see the defendant exit from his vehicle in front of yours that evening, after the officers pulled in behind?"

7. "Do you know the whereabout of George Dewey Browning?"

8. "Do you know the address or whereabouts of Richard Fuller, Jr.?"

[2]". . . And he informed me that a George Browning was the passenger in the front seat of the Cadillac that he was the driver of.

"And that after the car was stopped, the right door was opened and Browning got in the rear seat by the time Officer Peters approached the vehicle, and that he first observed the defendant exiting from the 1955 white sedan that was parked in front of him.

"And that that was the first time that he had seen the defendant.

"He further told me that Officer Peters could not have observed what was going on in the front seat when he was in a position at the rear of the Cadillac, because the man that was in the rear seat, a Mr. Fuller, weighed over 300 pounds and was an extremely large man.

"He also told me that Officer Peters did not search the Cadillac for contraband until after he had found a bogus $20 bill on the defendant, and placed him under arrest and handcuffed him and put him in the police unit, along with Mr. Harrison.

"It was at that time that the Cadillac was searched and the contraband that has been marked People's 1-A and 1-B had been discovered. . . ."

tions put to the driver on the stand would not tend to incriminate him, and he should have been ordered to answer. In effect, defendant asks this court to hold that a successful assertion of the privilege against self-incrimination with respect to a line of inquiry, automatically makes the assertees extrajudicial declarations on the subject admissible under section 1230 of the Evidence Code.

The first question before us is obviously whether the court erred in its determination that the driver properly invoked the protection of the privilege against self-incrimination. The proper judicial focus in such an investigation is upon the questions asked. The court need not determine what defendant's answers would be, nor that the answers would in fact tend to incriminate the witness. If the witness were required to prove the hazard, he would be compelled to surrender the very protection the constitutional privilege is designed to guarantee. "[T]he privilege forbids compelled disclosures which could serve as a 'link in a chain' of evidence tending to establish guilt of a criminal offense; in ruling upon a claim of privilege, the trial court must find that it clearly appears from a consideration of all the circumstances in the case that an answer to the challenged question cannot possibly have a tendency to incriminate the witness. (*Hoffman* v. *United States,* 341 U.S. 479, 486-488 [95 L.Ed. 1118, 1123-1125, 71 S.Ct. 814]; *Malloy* v. *Hogan . . . ,* 378 U.S. 1, 11-12 [12 L.Ed.2d 653, 661-662, 84 S.Ct. 1489]; *Zonver* v. *Superior Court,* 270 Cal.App.2d 613, 620 [76 Cal.Rptr. 10]; *Cohen* v. *Superior Court,* 173 Cal.App.2d 61, 68-70 [343 P.2d 286]; Evid. Code, § 404.)" (*Prudhomme* v. *Superior Court,* 2 Cal.3d 320, 326 [85 Cal.Rptr. 129, 466 P.2d 673].)

When the surrounding circumstances are considered, all doubts as to the propriety of the court's ruling are removed.[3] For example, even testimony that merely placed the witness at the scene could provide a "link in a chain" of evidence which could end in proof of the driver's possession of the heroin. Thus the trial court's refusal to instruct the driver to answer the questions put to him by defendant's attorney was not error.

The fact that it is within the judicial imagination that the answers to the questions asked of the driver could incriminate him does not, however, mean that the witness' extrajudicial statements as to the same subject matter necessarily fall within the penal interest exception to the hearsay

---

[3]There is perhaps some doubt as to the possibility of incrimination in the answer to the question "were you present in court and did you hear Officer Peters testify that he observed you exit the vehicle and run towards the corner?" Obviously, whether or not he heard Officer Peters so testify is immaterial as to the truth of the officer's testimony. The question, however, was wholly foundational, and an answer to it could not have aided defendant's efforts to secure from the witness testimony as to the events surrounding the arrest.

rule as found in section 1230 of the Evidence Code. Defendant's only argument at trial that the driver's extrajudicial statements were against his own penal interest, was that apparently the trial judge felt that the statements were incriminating to the driver, or he would have ordered the driver to answer the questions put to him on the stand. The argument is not well taken.

The trial court ruled that there was nothing in the driver's extrajudicial statement which would subject him to criminal liability. The test here is not whether the statement could provide a link in a chain of evidence leading to the declarant's criminal liability, but whether the statement satisfies the reason why declarations against interest are admitted as an exception to the hearsay rule. ■ According to Wigmore "[t]he basis of the Exception is the principle of experience that a statement asserting a fact distinctly against one's interest is unlikely to be deliberately false or heedlessly incorrect, and is thus sufficiently sanctioned, though oath and cross-examination are wanting." (5 Wigmore, Evidence (3d ed. 1940) § 1457, pp. 262-263.)

■ It is hard to see how, under all the circumstances, the driver should have realized that the statement he made to defendant's counsel was "distinctly" against his own penal interest. While an attorney, well versed in the law concerning the possible inferences of constructive possession which arise when narcotics are found in an automobile, might appreciate that an individual defendant is in a better position to disavow any connection with the narcotics, the more people are found to be in the car, this is too subtle a point to be appreciated by the average layman. Essentially all that the declaration did was to substitute George Browning for defendant as the front seat passenger. To be sure, it covered affirmatively certain matters concerning which the declarant had claimed the privilege against self-incrimination. However, the fact that, on the advice of counsel, he had stood on his constitutional rights as a witness in no way proves that he appreciated that, when he admitted such matters as being on the scene in the statement to defendant's attorney, he might lighten the People's burden in any renewed criminal prosecution against himself.

## II.

■ Defendant's next assignment of error concerns the refusal of the trial court to grant immunity from prosecution to the driver under section 1324 of the Penal Code. Defendant claims that the statute allows the prosecution to secure immunity for its witnesses, but gives no correlative right to a defendant, and thus denied him equal protection of the laws. (U.S. Const., Amend. XIV.) Upon defendant's motion that the driver be granted

immunity, the court inquired whether the prosecution joined in the request. The prosecution did not join, whereupon the trial judge indicated that the only applicable statute, section 1324, contains no provision for a grant of immunity on a defense motion in the absence of a request by the district attorney.

The court was faced with a similar issue in *People* v. *Williams,* 11 Cal. App.3d 1156 [90 Cal.Rptr. 409]. There it held that defendant's constitutional rights were not violated by the trial court's failure to apply section 1324. We reach the same conclusion here. (See also *People* v. *Hernandez,* 19 Cal.App.3d 411, 418 [96 Cal.Rptr. 854]; *In re Marshall K.,* 14 Cal. App.3d 94, 99-100 [92 Cal.Rptr. 39].)

The thrust of defendant's argument seems to be that the equal protection clause requires that all the rights available to the prosecution must be afforded defendants. To whatever extent this theory has application in criminal procedure, it has no application here. ■ The decision as to who shall be granted immunity is ultimately a legislative function. (See 8 Wigmore (McNaughton rev. 1961) Evidence, § 2281, pp. 490-508; 13 A.L.R.2d 1439; 21 Am.Jur.2d 219-220, Criminal Law, § 150; 98 C.J.S. 259-263, Witnesses, § 439; *People* v. *Groves,* 63 Cal.App. 709, 714 [219 P. 1033] (dictum).) Necessarily prosecuting attorneys must exercise considerable discretion in this area, subject to the guidelines established by the Legislature. (42 Am.Jur. 245, Prosecuting Attorneys, § 14; 16 Cal.Jur.2d, Rev., 363, District and Prosecuting Attorneys, § 8.) The Fourteenth Amendment to the United States Constitution does not require that the power to trigger the effect of a law such as section 1324 of the Penal Code which the Legislature has vested in the district attorney must also be exerciseable by a defendant. Clearly a legislature can react differently to the probable motives of a prosecutor who requests immunity, and those of a defendant in a criminal case.

### III.

■ Defendant next contends that , during his trial, his right to freedom from unreasonable search was violated, and that the testimony based on the search was inadmissible. During the People's rebuttal a police officer qualified as an expert on narcotics use was permitted, over defendant's objections, to examine defendant for evidence of such use. He testified after the examination that it was his opinion that defendant was then under the influence of narcotics, that there were no physical indications of injections of narcotics as old as the date of defendant's arrest, but that the quantity of fresh marks indicated that defendant was a heavy user of narcotics.

At trial, defendant's counsel was unable to offer any authority for his

contention that the examination, conducted during a recess in a room apart from the courtroom, was improper, and we have found none. The examination was limited by the trial court to defendant's head, arms, hands, and legs, and evidently lasted about 10 or 15 minutes. Defendant's counsel was allowed to be present at the examination.

The examination of defendant was certainly less of an intrusion into his privacy than that which would have been sanctioned at the time of his arrest. (*Schmerber* v. *California,* 384 U.S. 757 [16 L.Ed.2d 908, 86 S.Ct. 1826].) The examining officer merely counted and characterized marks on defendant's arms and hands, looked in his eyes, and noted certain outward physical characteristics, such as perspiration. This involved little more than had occurred the day before, when defendant during cross-examination had been requested by the prosecuting attorney to exhibit his bare arm to the court. Defendant complied without objection. One of the arresting officers was at that time also allowed to examine defendant's arm. The only significant differences between the examination complained of and that of the day before was the amount of time expended and the expertise of the person making the examination.

Defendant's contention that the testimony as to the findings made during the examination was not properly admissible in any event, is similarly without foundation. The theory under which the testimony was first offered and admitted was as impeachment of defendant's assertion that he had never used narcotics and that marks observed on his arms during his testimony were an "old tattoo." Since this question is collateral to the issue of defendant's guilt of the crime charged, we do not doubt that it could properly have been excluded by the trial court as improper impeachment. The court, however, ruled otherwise, and was within its discretion in doing so. (*People* v. *Eisenberg,* 266 Cal.App.2d 606, 615 [72 Cal.Rptr. 390]; Evid. Code, §§ 351, 352. See Law Revision Com. comment to Evid. Code, § 780.)

During further argument on the admissibility of the officer's testimony, the People expressed a desire to have the testimony admitted for all purposes. Further testimony was then elicited from the officer, consisting of the officer's opinion that defendant was a user of narcotics at the time of his arrest. With the addition of this opinion the entire testimony became directly relevant to the culpability of defendant as to one element of the crime charged. "An essential element of the crime of possession of narcotics is knowledge of the narcotic character of the article possessed (*People* v. *Winston* (1956) 46 Cal.2d 151, 161 [293 P.2d 40]) and evidence of prior use of narcotics and presence of needle marks is admissible for such purpose. (*People* v. *Casas* (1946) 77 Cal.App.2d 255, 257 [175

P.2d 19].)" (*People* v. *Hancock*, 156 Cal.App.2d 305, 312 [319 P.2d 731]; *People* v. *Mora*, 232 Cal.App.2d 400, 405 [42 Cal.Rptr. 725]; *People* v. *Murray*, 198 Cal.App.2d 805, 810 [18 Cal.Rptr. 280]; *People* v. *Young*, 197 Cal.App.2d 129, 131-132 [17 Cal.Rptr. 283].)

### IV.

 This brings us to defendant's contention that the evidence was insufficient to show that he had dominion and control of the heroin and that he had knowledge of its narcotic character. Defendant offers *People* v. *Hancock*, *supra*, 156 Cal.App.2d 305, and *People* v. *Foster*, 115 Cal. App.2d 866 [253 P.2d 50], for the proposition that mere presence, even of an addict, at the scene of discovery of narcotics is not sufficient to support a conviction for possession. In the case at hand, however, the evidence presented by the People indicates circumstances other than "mere presence." The testimony of the arresting officers concerning defendant's flight from the seat in front of and under which the heroin was found is evidence of defendant's guilt, tending to show both dominion and control and knowledge. In addition, the evidence that defendant was a narcotics user at the time of his arrest certainly indicates knowledge of the character of the substance. The fact that the People's evidence was not uncontradicted is, of course, irrelevant, for it was apparently believed. If the circumstances reasonably justify the trial court's findings, reversal is not warranted merely because the circumstances might also be reasonably reconciled with a contrary finding. (*People* v. *Redmond*, 71 Cal.2d 745, 755 [79 Cal.Rptr. 529, 457 P.2d 321]; *People* v. *Williams*, 5 Cal.3d 211, 214 [95 Cal.Rptr. 530, 485 P.2d 1146].)

### V.

 The trial court ruled that a violation of section 11556 of the Health and Safety Code (knowing presence in a place where narcotics are being unlawfully used) is not an offense necessarily included in a charge under section 11500 of the same code. Defendant does not assign this as error, but he argues that the trial court should have amended the complaint, on its own motion, to charge a violation of section 11556.

This argument is apparently based on a distinction drawn by this court in *People* v. *Wilson*, 271 Cal.App.2d 60 [76 Cal.Rptr. 195]. There we distinguished a number of cases which had upheld treatment of section 11556 as an offense necessarily included within a charge of possession, noting that those cases were upheld on the theory that the proceedings were actually "informal amendments" of the information. That opinion goes on to hold, however, that this theory has no applicability where the lesser charge

is not itself supported by the evidence. (*People* v. *Wilson, supra,* 271 Cal. App.2d 60, 62-63; see *People* v. *Hensel,* 233 Cal.App.2d 834 [43 Cal. Rptr. 865].)

Here the trial court ruled at the time of defendant's motion for a new trial that there was not sufficient evidence of recent use to support a finding on the lesser charge. In any event the trial court was satisfied of defendant's guilt of simple possession of heroin as a lesser and necessarily included offense to the crime charged. Furthermore, defendant's motion was not for an amendment to the complaint to show a separate offense, but for a finding that section 11556 is a necessarily included offense. The court correctly ruled that it was not.

## VI.

Defendant's last point, as presented, has no merit. He claims that the trial court abused its discretion in failing to order a diagnostic study under section 1203.03 of the Penal Code. It seems obvious that if there was such an abuse, it was probably rectified by the court's request for a diagnostic study and recommendation pursuant to section 1168 of the Penal Code. (*Holder* v. *Superior Court,* 1 Cal.3d 779, 782, fn. 3 [83 Cal.Rptr. 353, 463 P.2d 705].)

The Attorney General's brief recognizes that the real issue is not the trial court's failure to commit defendant under section 1203.03, but the expressed reason for that refusal: because of a prior conviction involving the use of a deadly weapon, defendant was ineligible for probation unless, according to the terms of the sixth unnumbered paragraph of section 1203 of the Penal Code, the court found his case to be "unusual" and the district attorney concurred in the grant of probation. The deputy district attorney advised the court that he had been instructed "to suggest that the only appropriate punishment, as hard a decision as that is, in Mr. Traylor's case be a sentence on the state level," and that his office would not consent to probation, even if a referral under section 1203.03 would result in a favorable recommendation. The court then stated that under the circumstances such a referral was useless.[4]

These proceedings all took place several months before the Supreme Court's decision in *People* v. *Tenorio,* 3 Cal.3d 89 [89 Cal.Rptr. 249, 473 P.2d 993] which, quite recently, in *People* v. *Clay,* 18 Cal.App.3d 964 [96 Cal.Rptr. 213], was interpreted as nullifying the necessity of the district attorney's concurrence in "unusual" cases. Since the *Tenorio* rule is fully

---

[4]The record does not indicate why the court nevertheless requested a diagnostic study and recommendation pursuant to section 1168 of the Penal Code. We do not know whether the request was ever honored.

retroactive (*In re Cortez,* 6 Cal.3d 78, 82-83 [98 Cal.Rptr. 307, 490 P.2d 819]), it obviously applies on a direct appeal.[5]

The judgment is reversed as to the sentence, and the case is remanded to the Superior Court of Los Angeles County for that court to exercise its independent judicial discretion as to defendant's eligibility for probation.

Aiso, J., and Reppy, J., concurred.

---

[5]As noted above, the Attorney General, on this appeal, correctly analyzed the nature of defendant's real complaint. In a brief filed some months before the decision in *People* v. *Clay,* 18 Cal.App.3d 964 [96 Cal.Rptr. 213], he argues most persuasively that the *Tenorio* principle does not apply to the sixth unnumbered paragraph of section 1203.03. We feel, however, bound to follow the *Clay* holding.