[Crim. No. 6249.    First Dist., Div. Three.    Jan. 30, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. IRVING KOHN, Defendant and Appellant.

Sanford M. Skaggs, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Robert R. Granucci and John T. Murphy, Deputy Attorneys General, for Plaintiff and Respondent.

SALSMAN, J.—Appellant Irving Kohn and his assistant Peter Baird were jointly indicted by the grand jury on charges of conspiracy and extortion. (Pen. Code, §§ 182, 518.) The indictment contained six counts. They were acquitted on one count of conspiracy, but convicted on all remaining counts. Appellant was sentenced to the Department of Corrections for the term prescribed by law, with the express provision in the judgment that, as to counts 2, 4 and 6 sentences were to run consecutively, As to counts 3 and 5, sentence was to the Department of Corrections, but execution was stayed pending appeal and during the service of sentences on counts 2, 4 and 6, the stay then to become permanent. The judgment further provided in effect that, if $50,000 cash were to be paid into court by April 1, 1967 as restitution to the victims of extortion, the consecutive sentences imposed under counts 2, 4 and 6 would be made concurrent. Only Kohn's appeal is before us.

Appellant is, or was until his conviction and imprisonment, a private investigator in San Francisco. The indictment against him and his assoicate Baird stems from the complaints of three persons, Mrs. Stewart, Mr. White and one Thompson, a 19-year-old drug addict. Mrs. Stewart and Mr. White separately employed appellant and became his victims during or shortly after the employment, and Thompson became entangled in his evil web through association with Mr. White.

One of appellant's main contentions is that the evidence is insufficient to support his conviction on any count of the indictment. It becomes necessary, therefore, to recite the facts in sufficient detail to illuminate this argument.

### MRS. STEWART'S CASE

In 1964 Mr. and Mrs. Stewart operated a store in San Francisco. They had been in business for many years and were financially successful. Mrs. Stewart became suspicious of the relationship between her husband and one of the store's employees, Mrs. Warnke. Mrs. Warnke's employment was terminated. About six months later, Mrs. Stewart, still suspicious, consulted appellant Kohn and hired him to investigate the

conduct of her husband and Mrs. Warnke. Appellant worked on the case for several months. He made alarming oral reports to Mrs. Stewart that her husband planned to sell the business; that he had promised Mrs. Warnke a fur coat, and that the pair had been seen together at a hotel. In a few months Mrs. Stewart paid Kohn about $20,000 in ''fees.'' She became increasingly nervous and upset.

Strange things happened to Mr. Stewart and Mrs. Warnke during appellant's investigation: Mrs. Warnke received threatening telephone calls; a flare was thrown through the front window of her home; rocks with cryptic messages tied to them were thrown through the window of the store; a burning flare had been stuffed into the gas tank of Mr. Stewart's car while the car was parked in his garage; his car was set afire while he and Mrs. Stewart were at a motel in Calistoga. Because of this violence and her deep anxiety, Mrs. Stewart called off the investigation.

On August 24, 1965 appellant Kohn urgently requested Mrs. Stewart to come to his office at once. She met Baird at a drugstore near her place of business and he drove her to appellant's office. A man in police uniform came in. He displayed a badge and threatened to arrest all of them for intent ''to do bodily harm.'' He handcuffed appellant and waved blue papers before everyone and announced that the papers were arrest warrants. Mrs. Stewart was terrified.

Appellant and the man in police uniform went into another room. Appellant returned shortly and told Mrs. Stewart that if each of them paid a sum of money to the man all could go free. He said $15,000 was demanded from Baird, $15,000 from himself and $30,000 from her. Mrs. Stewart quickly agreed to pay and tried to raise the money at once, using appellant's office telephone. She failed. Appellant then called White, who was treasurer of a large savings and loan association. He asked White to cash Mrs. Stewart's personal check for $30,000, and explained her financial standing. White knew appellant and Baird. Baird brought Mrs. Stewart to the savings and loan offices and introduced her to White, who at once accepted her personal check for $30,000, and gave her an association check for a like amount. White then escorted Mrs. Stewart across the street to the Wells Fargo Bank. Baird stayed outside. The bank, in White's presence, cashed the savings and loan check and put $30,000 in cash in a cloth bag and gave it to Mrs. Stewart. Baird drove her back to appellant's office. She put the bag of money on the desk in front of appellant, who was still

handcuffed, and he dropped it between his feet beneath the desk. Baird took the blue papers from the man in police uniform and announced he would tear them up and flush them down the toilet. Mrs. Stewart left, to find money to back up the check she had given White at the savings and loan.

Mrs. Stewart told the story to her husband. They went to see White, and told him they could not cover the check at that time, but agreed to make it good. White, who was in fear of a bank examination, was very worried about the affair.

A day or two later, appellant came to the savings and loan office with $30,000 in cash to cover Mrs. Stewart's check in the event bank examiners should appear. White gave him a receipt for the money. On August 30 appellant demanded the money back and White gave it to him. The next day, Mr. and Mrs. Stewart went to the police.

The police questioned everyone. Appellant's story was that he had been employed and paid $1,250 to investigate Mr. Stewart; that he had arranged a loan for Mrs. Stewart in the amount of $30,000 from Mr. White, and that he had not seen her since. Baird told substantially the same story. As appellant and Baird left the Hall of Justice, after being questioned, they met White and gave him a ride home. They stopped at the savings and loan offices and secured and destroyed copies of the receipt White had given appellant when the latter brought in $30,000 in cash to cover Mrs. Stewart's check. Critically for appellant, however, they failed to destroy one of the copies of the receipt.

### The White Case

The facts in this case illuminate the strange behavior of White in the Stewart case, because some of the events in White's case took place before Mrs. Stewart parted with her money on August 24th at appellant's office.

White was treasurer of a savings and loan association. Early in June 1965 he spent an evening drinking in various bars. About 2 a.m. he set out to find a homosexual companion. He met Thompson, a 19-year-old drug addict. They engaged in a homosexual act at the savings and loan offices. White paid Thompson $25 to keep quiet. White asked Thompson to return on Saturday when the offices would be closed, and Thompson agreed. Thompson returned and White gave him $20, although no homosexual acts took place. Thereafter Thompson came back several times demanding larger sums of money from White and threatening to expose him.

White consulted appellant, who agreed to take White's case.

White paid appellant $900, $600 and $2,600 at different times. Later, when White saw Thompson near the savings and loan offices, he called appellant and gave him a description of Thompson. Appellant and Baird quickly appeared. They accosted Thompson and pretended to be "undercover" police, and acted as if to arrest Thompson and take him to the Hall of Justice. They drove Thompson around in their car for a time, and then returned to meet White. In White's presence appellant wrote out a statement in which Thompson admitted blackmailing White, and Thompson signed it. Thompson apologized to White, and was then driven by appellant and Baird to the bus depot and told to get out of town. White, satisfied and relieved, wrote appellant a letter of appreciation.

Not long after these events White began to receive mysterious, muted telephone calls. ("We know who you are. We know what you have done. We want $50,000. . . ." Later, a call from "Dave's mother" demanded $250,000.) White again consulted appellant. Baird told White that appellant was probably already aware of the nature of the calls because he had tapped White's telephone. The price of appellant's services escalated to $20,000 for an investigation of the calls. White didn't have the money. Appellant and Baird suggested that he make an "illegal loan" to himself (i.e., that he steal) from the savings and loan association. They also suggested outright robbery of the institution. White vetoed these ideas. He did offer to pay $30,000 over a period of 5 years if appellant could get him a loan of $20,000. He tried to borrow the money, but could not. He paid appellant $1,000 on account, however.

Thompson, committed to a state hospital, testified later before the grand jury. When Thompson was returned to the hospital, appellant and Baird took him away without authority but were apprehended, and Thompson was returned to the facility. When Thompson was ultimately released by the hospital authorities, he went to appellant's office and recanted his grand jury testimony. Appellant paid him several hundred dollars for this statement. Thompson used the money to buy drugs.

In the Stewart matter, appellant's defense was that he had been hired in the usual manner to make an investigation of Mr. Stewart's private conduct, and that he had reported his findings regularly to Mrs. Stewart. According to his testimony, his findings indicated nothing improper in the personal affairs of Mr. Stewart and he so reported to Mrs. Stewart. He

denied any acts of violence such as throwing stones through windows and putting flares in gas tanks. He testified that Mrs. Stewart came to him to inquire about a $30,000 loan and that he sent her to see White. He denied that he owned a police uniform, but the People's evidence established that in appellant's previous employment as a security officer he was required to wear and did have a complete police uniform. He also denied leaving $30,000 with White at the savings and loan association, and further testified that he had served White in the Thompson case and had charged a fee of $4,100 for his services. He denied that White had mentioned an extortion attempt after the Thompson affair had apparently been settled, and generally denied most of the incriminating testimony against him given by White and Mrs. Stewart.

Count 2 of the indictment charged appellant with extortion in that he obtained Thompson's signature by the wrongful use of fear, to an instrument which created a "right of action." (Pen. Code, § 522.)[1] Appellant contends there is no evidence to support his conviction on this charge, and we agree.

Section 518 defines extortion as follows: "Extortion is the obtaining of property from another, with his consent, or the obtaining of an official act of a public officer, induced by a wrongful use of force or fear, or under color of official right." Section 522 extends the definition in this language: "Every person who, by any extortionate means, obtains from another his signature to any paper or instrument, whereby, if such signature were freely given, any property would be transferred, or any debt, demand, charge, or right of action created, is punishable in the same manner as if the actual delivery of such debt, demand, charge, or right of action were obtained."

The document signed by Thompson under appellant's coercion was never put in evidence. We do not know exactly what its contents were. Some evidence of its contents came from Thompson, who denied ever reading it, but testified that appellant told him it said that he had been blackmailing White and would stop doing so. White, who was present when the document was signed, did not know what its contents were.

Obtaining "property" within section 518 has been held to include obtaining an appellant's acquiescence in the dismissal of an appeal (*People* v. *Cadman*, 57 Cal. 562, 564), but to exclude obtaining a court appointment as a receiver (*People* v. *Robinson*, 130 Cal.App. 664 [20 P.2d 369] ; criticized in 22

---

[1] All section references hereafter are to the Penal Code unless otherwise noted.

Cal.L.Rev. 225). The only case discussing section 522 merely holds that delivery of a check obtained by extortionate means need not be made directly into the hands of the defendant (*People* v. *Peppercorn,* 34 Cal.App.2d 603, 608 [94 P.2d 80]), although the check may be one which the drawee bank would refuse to honor if it were presented. (*People* v. *Peppercorn, supra; State* v. *Barr,* 67 Wash. 87 [120 P. 509].) Whether "property" or an instrument creating a right of action can be construed to include a written confession of blackmail is thus a question of first impression in California.

██ Appellant correctly contends there is no evidence to show that the paper signed by Thompson created any right of action, or debt, or transferred any property in violation of section 522. There is no doubt but that appellant obtained Thompson's signature by coercive means. But we see no evidence that the document created any obligation or operated so as to transfer any property. Simply stated, the Penal Code section does not embrace the obtaining of a confession of blackmail by extortionate means.

The Attorney General argues, however, that the document did create a right of action in that, if it was a confession, it made it possible for appellant, or the People, to prove that Thompson extorted White. We do not accept this view. If it was a confession, and the evidence suggests that is probably what it was, the document created nothing and transferred nothing. It did not alter or change the facts, or increase Thompson's civil or criminal liability for his past conduct. It might have made proof of Thompson's liability easier in either criminal or civil proceedings, but it did not create a "right of action" within the meaning of section 522.

Moreover, the document does not create any right of action in appellant's behalf against White. It was but evidence of past immoral conduct on the part of White which, if revealed, would have brought disgrace to him. Its possible future use by appellant as a convenient weapon in a later extortion of White is also readily apparent. But we do not think the language of section 522 proscribes appellant's oppressive conduct. As will appear, however, his actions clearly violated section 518 in other respects, and he was properly convicted of the extortion of both Mrs. Stewart and White.

██ Appellant next argues that the evidence does not support his conviction on count 4. Conviction on this count rested in part upon evidence that White, after Thompson's departure, began to receive mysterious telephone calls demand-

ing large sums of money, with the clear implication that if the money was not paid, exposure would follow. Appellant argues there is no evidence to show that he, or anyone acting on his behalf, made such telephone calls.

It is true there is no direct evidence that appellant made the calls to White. But that he or someone on his behalf made them is a reasonable inference the jury could draw from all of the evidence before it. There was, for example, evidence that Thompson told no one of his conduct with White, not even his parents. The secret known by the caller was known only to Thompson, White, appellant and Baird. Two other facts also cast their weight upon the scales. The first is the size of the fee which appellant demanded—$20,000 to stop the telephone calls. Second, appellant had a ready plan by which his victim could quickly raise the fee—by simply stealing it from the savings and loan association. These facts support the inference that appellant, directly or indirectly, was the author of the cryptic telephone messages received by White, and that their odious purpose was to prepare White for a quick shakedown.

█ Appellant also argues it was error to admit evidence of the telephone calls because they were pure hearsay. (Evid. Code, § 1200.) We do not agree. The evidence was not received to establish the truth of anything said by the person or persons who made the calls. Its purpose was to prove that some telephone calls had been received by White and that he was thus put in fear. Such evidence is not hearsay. (*Rogers* v. *Superior Court,* 46 Cal.2d 3, 8 [291 P.2d 929], and cases cited.)

We therefore find that the evidence fully supports appellant's conviction on count 4.

Count 3 of the indictment charged appellant and Baird with conspiracy, and as an overt act alleged that he and Baird met together on August 18, 1965 to carry out the objective of the conspiracy. Appellant's argument that there is no evidence to support his conviction on this count is without merit. The evidence is that he and Baird met White at appellant's office on August 18, 1965, and appellant agreed to take White's case for a substantial fee, and promptly offered a tailor-made plan whereby White could get the money and pay the fee. From this, and other evidence heretofore recited, the jury could reasonably infer that appellant and Baird conspired to extort money from White under the guise of a fee for investigative services made necessary by appellant himself.

██ After the prosecuting attorney had completed his argument to the jury, and after appellant's counsel had completed his argument, the court permitted the case to be reopened and evidence introduced to refute a contention advanced by appellant's counsel. Appellant contends this was error and prejudicial to his defense. The point at issue was this: Mrs. Stewart, her husband and her sister had joint bank accounts. One bank book bore the notation "two signatures necessary." The books showed that, over a period of years about $30,000 had been withdrawn. The People had put the bank book in evidence for an unrelated purpose, without comment on the requirement of two signatures. In his closing argument, appellant's counsel argued that Mrs. Stewart withdrew it, and implied that the second required signature had never been obtained, or if obtained, was a forgery. In view of the dissension between Mrs. Stewart and her husband it was contended she needed a $30,000 loan to replace the money withdrawn, and that she came to appellant for help in getting a loan in that amount. If true, this would have tended to support appellant's story that Mrs. Stewart had merely asked his help to obtain a loan. But, as the evidence introduced after the case was reopened demonstrated, counsel's argument was based upon a false premise, namely, that two signatures for withdrawal of funds had been required to make withdrawals from the time the accounts were opened. In fact, the words "two signatures necessary" were added only after the facts of this case came to light, and the implication that Mrs. Stewart had wrongfully withdrawn funds from the accounts was therefore unwarranted. It is true that this evidence deflated the argument, but there was nothing unfair in exposing the facts. Whether either side should be permitted to reopen its case in given circumstances is almost wholly within the discretion of the trial judge. His ruling must stand in the absence of a clear showing of an abuse of discretion. (See *People* v. *Richardson*, 192 Cal.App.2d 166, 169 [13 Cal.Rptr. 321], and cases cited.)

██ There is no support for appellant's contention that he was denied due process of law because the court did not conduct a full hearing on the question whether he was sane at the time of trial. (§ 1368.) The court made all the inquiry required. Appellant did not contend he was insane and his counsel repeatedly denied that such a contention was being made. Rather, appellant called three doctors who testified as to appellant's mental condition, his memory, and the effect of the

heavy dosage of tranquilizing drugs he was then using. Most of this testimony was heard in chambers. As a result of it, the trial judge recessed the trial, appointed psychiatrists to examine appellant, received their reports at a later hearing in chambers, found appellant presently sane, and resumed trial of the criminal charges. Nothing more was required. At the hearing in chambers, appellant could have offered any relevant evidence to rebut the reports, but produced none. As we have related, he did not contend he was insane, nor did his counsel. The trial court's caution in protecting his rights was perhaps greater than required, and more than appellant asked, but commendable nevertheless as a scrupulous effort to grant him a fair trial.

■ Appellant also assigns misconduct of the court and prosecutor as a ground upon which the judgment should be reversed. We have examined the record of the alleged misconduct and find nothing to justify the charge. The following exchange occurred between court and counsel. It is typical of other comments assigned as misconduct, and illustrates the lack of merit in this aspect of the appeal. "THE COURT: You [appellant's counsel] said you didn't want to be hypertechnical, but you are being hypertechnical. MR. PURCELL: All right. Well, then, I will be hypertechnical. THE COURT: All right, so long as we understand that that's what you are being."
Charges of no greater weight than the one cited are made against the prosecutor. Even viewed as a whole, they do not support a charge of misconduct by either prosecutor or judge.

■ Finally, appellant argues that the trial court's judgment is in excess of its jurisdiction. As we have related, appellant was sentenced to the Department of Corrections. Consecutive sentences were imposed on counts 2, 4 and 6. He was also sentenced to the Department of Corrections on counts 3 and 5, but execution of these sentences was stayed pending appeal and during service of the sentences imposed under counts 2, 4 and 6. The judgment further provides that, if $50,000 is paid into court for restitution to the victims, the consecutive sentences will be made concurrent. Judgment was pronounced December 7, 1966. The court expressly reserved jurisdiction "pursuant to section 1168 of the Penal Code" to permit the modification noted, but further declared that "After April 1, 1967, the Court will not touch any of the foregoing sentences."

There is room to doubt the jurisdiction of the court to amend its judgment after pronouncement, particularly after appellant entered upon a period of restraint under the judgment. But we need not decide that question. Whether the court has power to recall its previous consecutive sentences and make them concurrent upon appellant's payment of the amount stipulated for restitution is moot. The provision in question, which was distinctly for appellant's benefit, was never met, because it is conceded no restitution by appellant in any amount has ever been made.

The judgment of conviction is reversed as to count 2 of the indictment. In all other respects, the judgment is affirmed. The appeal from order denying motion for new trial is dismissed.

Draper, P. J. and Brown (H. C.), J., concurred

A petition for a rehearing was denied February 29, 1968, and appellant's petition for a hearing by the Supreme Court was denied March 28, 1968.