[Crim. No. 28168. Second Dist., Div. Five. Dec. 20, 1976.]

THE PEOPLE, Plaintiff and Respondent, v.
STEVEN CHARLES FROHNER, Defendant and Appellant.

**COUNSEL**

Robert G. Spitzer, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, James H. Kline and Marc E. Turchin, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**KAUS, P. J.**—Defendant Steven Charles Frohner was convicted by a jury of selling or furnishing LSD (Health & Saf. Code, § 11379, subd. (a); count 3) and acquitted of another count of selling or furnishing LSD (count 1) and one count of selling or furnishing cocaine (count 2).[1]

The skeletal facts in this case are not disputed. They involve David Crawley, a Los Angeles County deputy sheriff; Guy Covert, an informer and heroin dealer, and defendant, a quadriplegic and allegedly a wholesale narcotics dealer.

On October 2, 1974, Deputy Crawley and Guy Covert went to defendant's residence to buy LSD. Covert asked defendant whether he had the "AC"—that is, LSD—that defendant was "holding for" Covert. Defendant nodded. Another man, Scott—apparently defendant's atten-

---

[1]Defendant's motion to suppress evidence was granted with respect to counts 4 through 6, and these counts were dismissed.

dant—[2] removed an envelope from a dresser and handed the envelope to Deputy Crawley. The envelope contained about 100 tablets of LSD. Crawley handed $65 to Scott, who placed the money in a wallet, and the wallet in a nightstand drawer.

Deputy Crawley then asked defendant whether it would be possible to purchase "10,000 hits of acid" at a later date, and what they would cost. Defendant said that the acid would cost about 35 cents each.

On October 16, deputy Crawley and Guy Covert again went to defendant's residence. This time a woman, Debra Puma—another attendant—[3] was present. Covert asked defendant if he had the gram of cocaine that Covert "had discussed earlier with him." Defendant said he did and told Covert to get a box from the bedroom closet and to weigh out a gram of white powder on a triple-beam scale in the bedroom. Defendant then told Puma to get a plastic bag for the powder. Deputy Crawley placed $80 on defendant's chest; Puma took the money, counted it and, on defendant's instructions, gave Crawley $5 in change which she obtained from a billfold in a nightstand next to defendant's bed. Covert handed the plastic bag to deputy Crawley.

Crawley discussed with defendant the purchase of liquid LSD in larger quantities. He asked defendant the price for two grams of LSD and was told that it would be $2,400, and that the sale could take place on October 21.

On October 21, Deputy Crawley returned to defendant's residence, accompanied by a federal drug enforcement administration agent. Guy Covert did not accompany them. The deputy showed defendant $3,600 in money, but defendant said that he did not then have the liquid acid. Defendant and Crawley then arranged to meet on October 24th.

On October 24, Crawley, after confirming by telephone that defendant had the acid, went to defendant's residence. The deputy was wired for sound; fellow narcotics officers surrounded defendant's house. Guy Covert again did not accompany Crawley. Defendant, who was in the living room in a motorized wheelchair, directed Crawley to a bedroom closet in which Crawley found a large sack containing a large brown

---

[2]William Randolf Scott, charged with defendant on count 1, pleaded guilty and was placed on probation with jail time.

[3]Defendant Debra Ann Puma was jointly charged and tried with defendant on count 2. Her motion to dismiss under Penal Code section 1118.1 was granted.

bottle containing liquid LSD and eyedroppers. On Crawley's signal, the other deputy sheriffs entered and defendant was arrested.

These facts were not disputed; the defense was entrapment. Defendant testified. The narcotics belonged to Covert, who "came and went as he pleased" in defendant's house. Covert had been furnishing defendant with heroin which relieved his pain, and defendant pretended to make sales for Covert because Covert "said that he would cut me off and put it around that I was to get nothing anywhere, and that he would also physically harm me or make sure that I was being harmed." Covert told defendant he owed the people with whom he was dealing a favor and could charge a higher price if it appeared that it was defendant who was selling the stuff to them.

Guy Covert, as noted, was present on October 2 and October 16 (counts 1 and 2). He was not present on October 24, 1974 (count 3). Trial was not held until September 1975. Guy Covert did not testify. He allegedly could not be located. What happened was this:[4]

In October 1972, Covert was convicted of possession of dangerous drugs and was placed on probation. In April 1974, he was arrested for possession of heroin for sale. In September 1974, Covert was arrested by deputy sheriff Kotler—the prosecutor's investigator in defendant's case—and charged with possession of heroin for sale. Deputy Kotler introduced him to Deputy Crawley. By October 1974, when the events in this case occurred, Covert had three cases pending—the heroin charges and the probation violation. In November 1974, Covert was again arrested for possession of heroin for sale.

Covert, subpoenaed by the district attorney at defendant's request, testified on January 16, 1975, at the preliminary hearing. He gave his address—10825 Burren in Lennox—and a telephone number. He claimed the privilege against self-incrimination on many questions, specifically, on grounds that he had "three matters presently pending," and that any questions concerning his "activities in narcotics sales"

---

[4]We have augmented the record with the transcript of defendant's preliminary hearing at which Covert testified that several cases were pending against him, and with Covert's superior court files in cases A-012254, A-186331, A-187195, and A-187460. In case A-187460, involving a November 1974 arrest, Covert's preliminary hearing was held the same day as defendant's preliminary hearing. It is not clear whether Covert included that case in indicating those pending against him; or when defendant or the trial court in defendant's case learned of the case. Covert pleaded guilty in A-187460 on September 16, 1975, shortly after defendant's trial.

would seriously incriminate him, and also that answering questions concerning defendant's case "could lead to his arrest for this case. . . ."

Later, it developed that the address to which Covert testified at the preliminary hearing may have been false even then; only nine days earlier, on January 6, he had given a different address and phone number to his probation officer, which in turn turned out to be a false address and a disconnected phone.

In May 1975, Deputy Kotler appeared in court at the request of Covert's attorney, and told the judge what Covert had done "to aid law enforcement; . . . ." On May 21, three of Covert's four pending cases were disposed of and he was placed on probation. The fourth case was, apparently, being handled separately. (*Supra,* fn. 4.)

On September 3, defense counsel informed the court that he had attempted to subpoena Guy Covert at the address which Covert had given when he testified at the preliminary hearing. However, according to the probation department Covert was not at that address. Defense counsel said that the probation department "would not provide me with any other address." The phone number Covert had given was disconnected.

Defense counsel said he wanted "a present location for Mr. Covert, because he's an absolutely, essential witness."

The prosecutor stated: "I have no idea where he is." He "would assume" that he "would have to go through the same procedure that [defense counsel] would have to go through" and suggested that defense counsel "be required to do it himself." The prosecutor admitted that he knew that defense counsel "was interested in the location of Mr. Covert." Another prosecutor who had handled defendant's case also did not know where Covert was. The prosecutor said that Covert "was present and did testify at the time of the preliminary hearing. We have no information beyond that which is presently available to [defense counsel]."

Defense counsel reiterated his statement that Covert was an important witness. The prosecutor asserted that since Covert had appeared at the preliminary hearing, the prosecution had no further duty to attempt to locate him.

The jury was chosen on September 4. On that date, the prosecutor furnished defense counsel with an address for Covert which Deputy Kotler had obtained from Covert's attorney. The court stated that it would contact Covert's probation officer. Defense counsel made clear that neither Covert's attorney nor Covert's probation officer would give him any information.

Trial began on September 5. The court said that it had "personally called" Covert's attorney and that Covert's attorney "indicated that he will make an effort over the weekend to secure Mr. Covert's appearance here in court." The court also spoke to Covert's probation officer, who believed that Covert was in violation of his probation,[5] and asked the probation officer to prepare a report for the consideration of the sentencing judge in Covert's case, suggesting that the probation officer might "request that a bench warrant issue for Mr. Covert's arrest and declare that he was in violation of probation and by that method attempt to secure Mr. Covert's presence here in court."

On September 8, the court reported that Covert's attorney had phoned to say that he had been unable to contact Covert. The court also learned that the probation officer had presented to the court in Covert's case a document that would indicate Covert to be a deserter, and that a bench warrant was issued that day.

By September 10, the court, defense counsel and the prosecutor considered using Covert's testimony at the preliminary hearing. However, after the court edited out all references to Covert's claims of self-incrimination, defense counsel concluded that the testimony—shorn of answers to questions concerning Covert's involvement in narcotics—would be useless and confusing.

As noted, Covert did not testify at the trial. However, on September 16, two court days after the jury had begun deliberations, defense counsel, having learned—apparently through the court—that Covert was in custody, moved to reopen the trial. Covert had been found because, according to the court's information, "the officer, Deputy Kotler, went by there and picked him up, and Mr. Covert had been living in Venice, not where his attorney thought he was." Covert had been arrested September 15.

[5] The probation violation in cases A. 012254, A. 186331, A. 187195—disposed of May 21, 1975—was Covert's failure to report to his probation officer.

The court denied defendant's motion.

A short time later, the jury returned with its not guilty verdict on count 1, resumed deliberations, requested the next morning that the instruction on entrapment be re-read, and then, about an hour later, returned with its verdicts of not guilty on count 2 and guilty on count 3.

The facts will be fleshed out in the discussion.

## DISCUSSION

Defendant's chief contention is that the failure of the prosecutor to maintain contact with Guy Covert, a material defense witness, deprived him of a fair trial. In connection with this core contention, he also contends, that the prosecutor committed prejudicial misconduct during closing argument; and that the trial court abused its discretion in denying defendant's motion to reopen the trial when Covert was located.

### Duty to Locate Informer

The rules are clear. ■ "When an informer is a material witness on the issue of guilt, the People must disclose his identity or incur a dismissal. [Citations.]" (*Eleazer* v. *Superior Court,* 1 Cal.3d 847, 851 [83 Cal.Rptr. 586, 464 P.2d 42].) "Identity" is not limited to the informer's name, but includes "all pertinent information which might assist the defense to locate him." (*Ibid.*) ■ Although the state is not required to produce the informer "the police and the district attorney" must "undertake reasonable efforts in good faith to locate the informer so that either party or the court itself . . . could, if it so desired, subpena him as a witness." (*Id.,* at p. 853 [Italics omitted].) ■ Finally, the defendant is not required to show that he cannot readily obtain the information through his own efforts. "If investigation [to locate the informer] is necessary at a later date it is still better undertaken by the prosecution both because of its greater investigatory resources and its superior knowledge of, and contacts with, the informer." (*Id.,* at p. 854.) This duty applies whether the informer is an amateur or a professional. (*People* v. *Goliday,* 8 Cal.3d 771, 779-781 [106 Cal.Rptr. 113, 505 P.2d 537].)

■ The duty applies only where the informer is potentially a material witness on the issue of guilt. There must be a "reasonable possibility" that the informer's testimony could exculpate the defendant. (E.g., *Williams* v. *Superior Court,* 38 Cal.App.3d 412, 418-421 [112

Cal.Rptr. 485] and cases discussed.) "The police bear no duty to obtain information about a person who is not a material witness, who 'simply points the finger of suspicion toward a person who has violated the law.' " (*People* v. *Goliday, supra,* 8 Cal.3d 771, 782.)

■ The Attorney General recognizes the rule but contends that as to count 3—the only count of which defendant was convicted—Guy Covert was not a material witness because he was not present at the time of the count 3 sale, and, therefore, there was no reasonable possibility that Covert's testimony could exonerate defendant.

On this record, the Attorney General's contention is erroneous. Defendant was, of course, separately charged for the transactions on October 2, October 16 and October 24. However, the People's theory from start to finish—and we set forth in the footnote some of the prosecutor's closing argument—was that defendant was a major dealer and that the three transactions were part of defendant's routine business.[6]

Similarly defendant's theory from start to finish was that Covert—who was concededly acting on behalf of the police—was actually the owner of the narcotics involved in all three transactions. In this dual capacity—owner and police informer—Covert had forced[7] defendant to

---

[6]After informing the jury that the trial court would tell them "that you have to consider each one of these counts individually," the prosecutor then reviewed the facts of the case. "[W]ith respect to October 2nd, . . . Covert, along with Deputy Crawley, came into [defendant's] bedroom for the purpose of purchasing LSD, 100 tabs of LSD. . . . [¶] At that point in time [after the deal was consummated] there's some discussion. Crawley says to [defendant] something to the effect that, 'I'd like to get 10,000 hits of acid.' . . . 'What's the price going to be?' . . . [defendant] says, '35 cents. If I buy in volume, you get a discount.' . . . [¶] At that point they discuss some kind of a future transaction. . . . [Crawley] comes back later on the 16th of October. The informant is there again. . . . There's a conversation at that particular point in time as to again a future purchase of LSD. And Crawley at that point is asking not for individual hits of acid, individual doses, . . . . He's talking now about liquid grams. . . . [¶] And there's some more conversation, which [defendant] tells Crawley, 'Look, you come over on Monday, October 21, 1974, and I'll have the stuff. You bring the money. We'll do it.' [¶] On October 21st Crawley comes over, pursuant to this prior arrangement, . . . . [Defendant says] 'Well, I don't have the stuff, . . . get back to me on October 24th.' . . . [¶] . . . What happens on the 24th? [¶] [Crawley] goes over to [defendant's] house. He walks in. There's nobody there except [defendant] and Crawley. . . . [Crawley] . . . asks [defendant] whether he's got the grams, and [defendant] says, 'Yes, I got the grams,' . . . [¶] . . . With respect to this particular offense, the first elements of these offenses: Control or possession. And clearly that's the case here when he had those things in various places in his room, was directing, first of all, Scott on the 2nd as to where the stuff was, was directing Covert on the 16th as to where it was, was directing Crawley on the 24th as to where the stuff was."

[7]We recognize that Covert's threats alone would not have amounted to legal duress or coercion. (*People* v. *Lo Cicero,* 71 Cal.2d 1186, 1190-1191 [80 Cal.Rptr. 913, 459 P.2d 241].)

engage in a series of sales by threatening him with physical harm, as well as withdrawal of his source of heroin. The facts relevant to this defense which, if believed, clearly amount to entrapment, are not the occurrences on October 24, but the dealings between defendant and Covert prior to any of the three sales in issue.

■ The Attorney General next contends that even if Covert was a material witness, since he asserted the privilege against self-incrimination at the preliminary hearing it was "sheer speculation" that if produced as a witness at trial he would testify that he owned the contraband and was forcing defendant to sell it.

We disagree. Granted that had Covert been a witness at the trial, Fifth Amendment problems were waiting in the wings, there are several reasons why this did not excuse the People's apparent indifference to Covert's availability.

First: In view of the general rule that a party who acts in good faith is entitled to have a witness claim his privilege against self-incrimination on a question by question basis (*People* v. *Shipe,* 49 Cal.App.3d 343, 349 [122 Cal.Rptr. 701]), defendant was entitled to have Covert in court.[8] We certainly cannot conclusively presume that Covert would have claimed the privilege at the trial or that he would have claimed it with respect to all the questions which triggered the claims at the preliminary hearing.

Second: Even if Covert had asserted the privilege at the trial, it is apparent that several of the bases for his claims at the preliminary hearing were no longer valid.

By the time of trial the three pending cases to which he referred at the preliminary hearing were resolved. (*Rebstock* v. *Superior Court,* 146 Cal. 308, 313-314 [80 P. 65]; *People* v. *Sierra,* 117 Cal.App.2d 649, 651 [256 P.2d 577]; compare *People* v. *Shipe, supra,* 49 Cal.App.3d 343, 349; *People* v. *Webster,* 14 Cal.App.3d 739, 743 [93 Cal.Rptr. 260].) The fourth case (see *supra,* fn. 4) was, apparently, not included in Covert's self-incrimination claim and may or may not have provided a basis for such a claim with respect to evidence relevant to this case.

Third: At the preliminary hearing Covert may have waived his privilege with respect to his involvement with defendant, or at least have

---

[8]This is not to say that defendant had the right that Covert claim the privilege in front of the jury; he did not. (*People* v. *Johnson,* 39 Cal.App.3d 749, 758-759 [114 Cal.Rptr. 545]; but cf. *People* v. *Chandler,* 17 Cal.App.3d 798, 803-804 [95 Cal.Rptr. 146].)

come perilously close to doing so. He testified freely that he twice accompanied Crawley on a narcotics investigation. He obviously knew that defendant was in possession of and selling narcotics.[9] There is at least a substantial question whether he could draw a Fifth Amendment curtain across an explanation of the basis of his knowledge. The privilege may be used "to suppress the truth, but that does not mean that it is a privilege to garble it; . . . ." (*United States* v. *St. Pierre* (2d Cir. 1942) 132 F.2d 837, 840 [147 A.L.R. 240]; see also *Rogers* v. *United States* (1951) 340 U.S. 367, 372-373 [95 L.Ed. 344, 348-349, 71 S.Ct. 348, 19 A.L.R.2d 378]; *Zonver* v. *Superior Court,* 270 Cal.App.2d 613, 621-622 [76 Cal.Rptr. 10].) Certainly we cannot accept as an axiom that no waiver would have taken place, had Covert testified in the superior court.

Besides, on the People's theory of the case—that Covert had nothing to do with the narcotics sold by defendant—Covert was clearly entitled to statutory immunity under section 11367 of the Health and Safety Code. Although this immunity would not apply if Covert, in addition to being a police agent, was actually the undisclosed principal of defendant (*People* v. *Sipress,* 51 Cal.App.3d 98, 101-102 [123 Cal.Rptr. 884]), it hardly lies in the People's mouth to suggest that Covert was not entitled to the statutory immunity because their theory of the case was factually incorrect.

Fourth: Regardless of whether defendant had a right that Covert be given statutory immunity by the People (Pen. Code, § 1324; see *People* v. *Beyea,* 38 Cal.App.3d 176, 203-204 [113 Cal.Rptr. 254]), the prosecution might have been hard put to deny a defense request for immunity, since on the People's theory of the case Covert had committed no crime in connection with defendant's sales to Crawley.

In sum, it is extremely questionable whether, had Covert been available, a Fifth Amendment claim with respect to the defense of entrapment would have been valid. Certainly, the mere possibility that it might have been, did not excuse the People from complying with their obligations under *People* v. *Goliday, supra,* 8 Cal.3d 771, 778-782, and *Eleazer* v. *Superior Court, supra,* 1 Cal.3d 847, 851.

---

[9]Covert admitted that he reluctantly agreed to cooperate with the police after his attorney had talked to Officer Kotler and was told that by cooperating Covert would avoid going to state prison. He claimed that he had been betrayed by Deputies Kotler and Crawley, because he had been led to believe that they were not after defendant, but "higher ups."

█ The Attorney General contends that, even assuming that Covert was a material witness, the prosecution made "reasonable efforts" to locate him. That assertion defies a record which shows that the prosecution did next to nothing to assure that Covert would be available for defendant's trial. The prosecution had ample notice: it knew, as early as January 1975, that defendant wanted Covert as a witness. Nor did it lack the opportunity to keep track of Covert: On this record, until May 21, 1975, Covert was subject to the prosecutor's good will. We know from Covert's superior court files that, in fact, he then appeared in court on the fourth case—a matter of which the prosecutor should have been aware—on May 30, July 9, July 24 and August 11, 1975. (*Supra*, fn. 4.) On September 4, the prosecutor did furnish defendant's attorney with an address for Covert, but this was the last prosecution effort to locate Covert for defendant, who could not be found at that address. All further efforts to locate Covert were made by the court and these were unsuccessful. It was only after a bench warrant had been issued in another proceeding that deputy Kotler went out to an address in Venice and picked Covert up.

In *Eleazer v. Superior Court, supra,* 1 Cal.3d 847, 853 and footnote 10, the court noted that what is reasonable will depend on the facts in each case: "If the informer has a regular abode and place of employment, simply obtaining his address and telephone number may suffice; if he is transient, or conceals his address, the law enforcement agency probably should make some arrangement for maintaining close communication with him."

Covert was an individual likely to conceal his whereabouts. He was a known narcotics dealer whose addresses changed rapidly. His probation officer could not keep track of him. He had betrayed defendant and defendant's friends. If Covert could not be located at the time of trial, that was due at least in part to the prosecution's failure to "make some arrangement for maintaining close communication with him." (*Eleazer v. Superior Court, supra,* 1 Cal.3d 847, 853, fn. 10.) If, however, Covert could be located on September 3 through 12, at the location where Deputy Kotler found him on September 15, the prosecution's failure to make Covert available in a timely fashion would suggest "a deliberate evasion of the defendant's right to a fair trial." (*Eleazer v. Superior Court, supra,* 1 Cal.3d at p. 853.) Either way, the prosecution failed in its duty.

The reason for the rule that requires the prosecutor to make reasonable efforts to locate an informer is clear in this case. First, the prosecution was in a position to keep track of Covert through his court appearances in the other pending case or cases, of which the prosecutor should have been aware. Second, defense counsel could obtain no information from Covert's probation officer and his attorney while the prosecutor had no difficulty in obtaining information from those sources. The best source, to whom defendant had no access, was apparently deputy Kotler, the prosecutor's investigator in defendant's case. (Compare *Bellizzi* v. *Superior Court,* 12 Cal.3d 33, 36-37 [115 Cal.Rptr. 52, 524 P.2d 148].)

However, the real issue in this case is whether the prosecution's failure to undertake reasonable efforts in good faith to locate Covert substantially prejudiced defendant. We note first that defendant's theory was not entirely implausible. The prosecution's case was that Covert, a known drug dealer, was working with the police and introduced Deputy Crawley to defendant, a major dealer. Defendant's defense was that Covert set him up—entrapped him—and used defendant's need for heroin and immobility as the threat. If defendant was running a narcotics business, he placed an unusual amount of trust in his customers. On October 16, Covert—in theory only a customer—was permitted to weigh out the cocaine himself, and on October 24, deputy Crawley was instructed by defendant to help himself to the LSD. On the prosecutor's theory, defendant was running a business in which wholesale prices ran $75 a gram—that is, 1/28th of an ounce—on the honor system. On defendant's theory, however, the operation becomes more plausible: he did not care whether he was cheated; the merchandise was not his.

Second, the prejudice to defendant must be considered in light of other errors asserted by defendant.

During the prosecutor's closing argument, the following occurred. The prosecutor was speculating concerning Covert's motives: "A man in [Covert's] position probably has to figure . . . the sooner I can . . . convince them that I'm cooperating, and giving them somebody bigger than I, the quicker I'm going to get off this thing." The reason why— . . . [¶] "[DEFENSE COUNSEL]: I object to the total line of argument as conjecture, speculation as to what Guy Covert's intentions were. Guy Covert should have been here. [¶] "THE COURT: . . . Overruled. [¶] "[PROSECUTOR]: *Counsel has subpoenas. If he wanted him here so you could look at him, he could have had him here.* Okay. [¶] "[DEFENSE

COUNSEL]: Your Honor, I take objection. [¶] "THE COURT: Overruled. You brought it up."

■ Defense counsel's objection should have been sustained. The prosecutor's comment was inexcusable. He knew that subpoenas could not be served on Covert. The only apparent reason for the comment was an improper one: to suggest to the jury that defendant had purposely failed to call Covert as a witness.

■ We would be inclined to think that the prosecution's failure to make reasonable efforts to locate Covert, coupled with the grossly improper comment by the prosecutor in closing argument, substantially prejudiced defendant.

■ However, under the circumstances, the trial court's refusal to reopen the case when Covert was finally located was, independently, serious error. Relevant to an assessment of the trial court's ruling is the course of the jury's deliberations. After selecting a foreman on September 12, the jury was excused until the next court day, September 15. After further instructions the jury began deliberations at about 10 a.m., and returned at about 3:30 p.m., to request that some instructions be reread. At that time, after twelve ballots, the vote was divided seven to five. The foreman said, "We are a hung jury, I guess, at this time."

The next day, September 16, at the jury's request a considerable number of instructions were reread: CALJIC No. 12.02—furnishing or giving away a controlled substance; CALJIC No. 12.32—amount sufficient to constitute a crime; CALJIC No. 12.33—proof of strength unnecessary; CALJIC No. 17.02—each count charges a separate and distinct offense. The jury deliberated for about three and one half hours and that afternoon returned with a not guilty verdict on count 1.

On Wednesday, September 17, the jurors wanted "the law regarding entrapment read to them; . . . ." Then, after deliberating for about an hour and a half, they returned with the verdicts of not guilty on count 2, and guilty on count 3.

It was just before the jury had brought in the not guilty verdict on count 1, that defense counsel learned that Covert had been arrested and was in custody. As noted, he moved unsuccessfully to reopen the trial to permit Covert to be called as a witness.

We, of course, .recognize the rule relied on by the Attorney General that the decision to permit a party to reopen its case is "almost wholly within the discretion of the trial judge . . . [whose] ruling must stand in the absence of a clear showing of an abuse of discretion." (*People* v. *Kohn,* 258 Cal.App.2d 368, 377 [65 Cal.Rptr. 867].) In *People* v. *Newton,* 8 Cal.App.3d 359, 383, 384 [87 Cal.Rptr. 394], in which the court held that the trial court had abused its discretion in not permitting the defendant to reopen his case after jury deliberations had begun, the court noted the factors to be considered in reviewing the exercise of the trial court's discretion: the stage the proceedings have reached when the motion is made; the diligence shown by the moving party in discovering the new evidence; the prospect that the jury would accord it undue emphasis; and the significance of the evidence. (*Id.,* at p. 383.)

We can understand the trial court's reluctance to reopen the case after the jury had begun deliberations. Nevertheless, defendant had wanted Covert all along, and the jury's difficulty in reaching a verdict suggested that it felt that something was missing. Had Covert testified, his testimony may well have been decisive one way or another. Thus, it would have been difficult for the jury to accord his testimony "undue" emphasis. Covert was, after all, not some last-minute alibi witness dredged up by the defendant. He was a lurking presence throughout this case.

The Attorney General makes much of defense counsel's asserted lack of diligence. He relies on the court's statement that it had "thought all along that you [defense counsel] could have made much more of a substantial effort yourself, . . . to get him here, which you didn't do." It seems that the trial court, which properly took credit for furnishing defense counsel with the information that Covert was in custody, had overlooked that even its own efforts were to no avail in procuring Covert's presence or in obtaining information that would lead to his presence, and that it was Deputy Kotler who, when properly instructed to do so, located Covert and brought him in.

We recognize also that the trial court may have suspected that all defense counsel wanted was reversible error. If so, granting leave to reopen would have called his bluff. All concerned would have known very quickly whether defendant's professed desire to have Covert as a witness was based on a hunch that Covert would never appear or on the hope that Covert would tell the truth, and that the truth would benefit defendant.

In all, we must conclude that the prosecution's failure to make reasonable efforts to locate Covert and the trial court's refusal to allow Covert to be called as a witness severely prejudiced defendant's case.

The judgment is reversed.

Stephens, J., and Hastings, J., concurred.