Filed 5/22/15  P. v. Carranza CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G049152 |
| v. | (Super. Ct. No. 11CF2429) |
| MARTIN OCHOA CARRANZA, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, John Conley, Judge.  Affirmed.

Melissa Hill, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Eric Swensen and Ryan H. Peeck, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Martin Ochoa Carranza was convicted of attempted premeditated murder for shooting his ex-wife twice while she was seated in a car with her new boyfriend. Although the facts show the shooting was part of a preconceived murder plan, appellant argues there is insufficient evidence he acted with premeditation. He also contends the trial court erred in refusing to let him reopen his case after the jury began its deliberations. Finding these arguments unavailing, we affirm the judgment.

FACTS

After 21 years of marriage, appellant and Maria Espinoza separated in October 2010. The separation was Espinoza's idea, and appellant was not happy about it. After Espinoza agreed to meet with him in late 2010, he implored her to give him another chance. When Espinoza said no, he showed her a gun and told her he had planned on killing her earlier that day while she was leaving work. Appellant told Espinoza their adult son Martin had talked him out of it. He also told her that if she went forward with the divorce, he was not going to accept it. Espinoza did not waver, and their divorce became final in January 2011.

Afterward, Espinoza often noticed appellant following her in his car. One time while she was driving home from work, appellant passed her on the freeway. As he went by, he held up his fingers in the shape of a gun, which frightened Espinoza.

In April 2011, appellant and Martin were at Espinoza's house working on appellant's car. Espinoza was not there at the time and had not given appellant permission to be at her home. However, appellant went into her house, forcibly entered her locked bedroom, and stole a personal item from her closet. Later that night, appellant peppered Espinoza with harassing phone calls while she was out celebrating her birthday. Appellant wanted to know who Espinoza was with, but she told him it was none of his business. The next morning, Espinoza discovered someone had let the air out of her car tires. Suspecting it was appellant, she obtained a temporary restraining order against him the following day.

2

The order became permanent in May 2011, but two months later, Espinoza noticed appellant as she was leaving work one day. As she was getting into her car, appellant drove by, and she asked him if he was following her. Appellant left the scene without answering the question.

A few weeks later, in August 2011, appellant invited Espinoza's brother-in-law, Renato Vasquez, over for a few beers. While they were drinking, appellant asked Vasquez if Espinoza was seeing anyone. By then, Espinoza had started dating her coworker Luis Gonzalez, but Vasquez said he didn't know anything about Espinoza's social life. Appellant became upset and said he was going to take revenge on Espinoza for all the bad things she had done to him. He also told Vasquez to tell his wife to say goodbye to Espinoza, because she was not going to be seeing her anymore. Vasquez urged appellant not to do anything drastic, but appellant said he had already made up his mind. He claimed the police were never going to catch him either, because he was going to flee or kill himself after taking his revenge on Espinoza. Although Vasquez thought appellant was drunk when he made these statements, he told his wife about them when he got home.

Appellant acted on his threats one month later, on September 2, 2011. Per her usual routine, Espinoza got up and got ready for work at around four o'clock that morning. After picking up coworker Maria Padilla in her car, Espinoza drove to Gonzalez's apartment to get him. When she arrived there, she scooted over to the front passenger seat, Gonzalez entered the driver's seat, and Padilla got in the back. They were buckling their seatbelts and getting ready to head out when appellant suddenly appeared on the driver's side of their car with a gun.

Accounts differ as to what happened next. According to Espinoza, appellant fired a shot outside the car and entered the backseat next to Padilla. Holding his gun to the back of Gonzalez's head, appellant ordered him to start driving, but Gonzalez didn't obey. Appellant then turned his attention to Espinoza and said, "I told

3

you that I was going to kill you if you were not mine again."  He also told Espinoza that "if [she] was not going to be his, [she] was not going to be anyone's."[1]  Espinoza begged appellant not to hurt her, but he pointed the gun at her forehead and pulled the trigger. Anticipating the shot, Espinoza raised her right arm for protection, and the bullet struck her arm.  She told appellant she was injured and not to shoot again, but he did.  As before, appellant fired while pointing the gun at Espinoza's forehead.  This time, Espinoza raised her left arm, and the bullet hit her between her shoulder and her elbow.

The shots prompted Gonzalez to exit the vehicle and confront appellant in the back seat.  As they were struggling for the gun, Gonzalez hit appellant's hand, and he dropped the weapon.  Gonzalez then turned and started to run away, but appellant grabbed the gun and shot him twice in the legs.[2]

By the time Gonzalez was shot, Espinoza and Padilla had exited the car. However, appellant pointed his gun at Padilla, so she ducked back into the backseat. Appellant followed her inside the car and told her, "You're going to die, too, you daughter of a whore."  Padilla grabbed appellant's gun, and while they were struggling for the weapon, a shot went off, hitting appellant in the leg.  Then appellant told Padilla to get out of the car because he was going to kill her.  Fearing for her life, Padilla ran behind some bushes with Espinoza.  While they were hiding, appellant asked Espinoza to tell him where she was, so he could kill her.  He also put the gun in his own mouth at one point.  However, rather than firing anymore shots, appellant got into Espinoza's car and drove away.

As appellant was driving, he reloaded his gun with six more bullets.  He thought about going to Tijuana, but his gunshot wound was too painful, so he called the police and surrendered at a gas station.  When the police examined Espinoza's car, they

---

[1]  Gonzalez testified he heard appellant tell Espinoza something to the effect that she was "fucked" and about to die.

[2]  While Gonzalez testified appellant shot him while he was trying to run away, Espinoza testified appellant shot Gonzalez while he was lying on the ground.

4

discovered numerous bullet holes in the vehicle and a loaded .357 revolver on the floorboard near the driver's seat. The police also searched appellant's car, which was found about a mile from Gonzalez's apartment. The vehicle contained ammunition for a .357 revolver, a wig, binoculars, and note cards reflecting locations where Espinoza had been on certain dates in the preceding months.

After waiving his Miranda rights, appellant told investigators he merely intended to scare the victims. Asked why he brought along a loaded gun to do so, he said, "I was desperate. I love [Espinoza] a lot . . . and I can't control myself." While admitting that he planned on confronting Espinoza and that he did in fact shoot her and Gonzalez, appellant claimed he only wanted to frighten, not kill, them.

At trial, appellant changed his story and denied shooting anyone. He told the jury the gun went off while he and Padilla were struggling for the weapon, and although he was holding the gun at the time, Padilla is the one who exerted force on the trigger and caused the weapon to go off. Appellant also denied making any threatening statements during the incident. In fact, he claimed he never threatened, followed or harassed Espinoza. Asked to explain all of the times he ran into her following their separation, appellant said their meetings were sheer coincidence. He said the reason he confronted Espinoza with a gun on the day of the shooting is because he was planning on moving to Texas the next day and just wanted to talk to her one more time before he left.

The jury did not believe him. While it acquitted him of attempting to murder Padilla and stealing Espinoza's car and was unable to decide whether he attempted to murder Gonzalez, it convicted him of attempting to murder Espinoza with premeditation and deliberation. The jury also found appellant guilty of three counts of making a criminal threat, domestic battery with corporal injury, stalking in violation of a restraining order and misdemeanor violation of a protective order. In addition, the jury found true allegations appellant used a firearm, discharged a firearm that caused great bodily injury, and inflicted great bodily injury under circumstances involving domestic

5

violence. The trial court sentenced appellant to life in prison with the possibility of parole, plus 25 years to life.

*Sufficiency of the Evidence*

Appellant argues there is insufficient evidence to support the jury's finding that, in attempting to kill Espinoza, he acted with premeditation and deliberation. We strongly disagree.

Courts traditionally look at three categories of evidence in determining whether there is sufficient evidence to support a finding of premeditation and deliberation: 1) Planning, 2) motive and 3) the manner in which the killing or attempted killing occurred. (*People v. Anderson* (1968) 70 Cal.2d 15.) These categories are intended "to aid reviewing courts in assessing whether the evidence is supportive of an inference that the killing [or attempted killing] was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse. [Citation.]" (*People v. Perez* (1992) 2 Cal.4th 1117, 1125.) We must remember "premeditation can occur in a brief period of time. 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . .' [Citations.]" (*Id*. at p. 1127.)

In reviewing appellant's claim, we must also keep in mind the standard of review for assessing the sufficiency of the evidence to support a criminal conviction is "highly deferential." (*People v. Lochtefeld* (2000) 77 Cal.App.4th 533, 538.) Our task is to "review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence . . . from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.]" (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.) In so doing, we do not reweigh the evidence or reevaluate the credibility of the witnesses who testified at trial; rather, "[w]e presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings,

6

reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.]" (*Ibid*.) "The conviction shall stand 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [it]."'" [Citation.]" (*People v. Cravens* (2012) 53 Cal.4th 500, 508.)

Turning this standard of review on its head, appellant argues the evidence shows that, in attacking Espinoza, he only intended to use the gun to hold her captive in the car long enough to talk to her and persuade her to reconcile with him. And even if he did intentionally fire several shots at Espinoza, "the evidence as a whole overwhelming[ly] suggests that he did so pursuant to a rash impulse." This characterization of the evidence is based on an isolated review of the record. It presumes everything appellant testified to at trial was true even though the jury rejected his version of events. As explained above, we are not at liberty to second-guess the jury's decision in that regard. Instead, we must draw all factual inferences in favor of the judgment below.

Doing so paints a very incriminating picture of appellant's intent. He stalked and harassed Espinoza for several months before the shooting. He said he was not going to accept their divorce but instead make her pay for leaving him. He acquired a gun and contemplated shooting her outside her workplace. Then, in an early morning surprise attack, he confronted her with a loaded gun while she was with her new boyfriend. During the attack, he said he was going to kill Espinoza because he couldn't have her and proceeded to fire two shots at her head at point blank range. When that didn't do the trick, he went looking for Espinoza and asked her to tell him where she was hiding so he could finish the job. He also shot her boyfriend twice and threatened to kill Padilla before fleeing the scene and contemplating a run for the border.

Even though appellant was emotionally distraught at the time of the shooting, and the evidence regarding the event was conflicting in some respects, there

7

was substantial evidence from which the jury could reasonably conclude appellant carried out a preconceived plan to kill Espinoza on the morning of the shooting. Indeed, appellant's words and actions clearly indicate the shooting was the result of preexisting reflection as opposed to a rash impulse. It could easily have been filed as a "lying in wait" case. We are powerless to disturb the jury's finding he committed attempted premeditated murder.

*Reopening of Appellant's Case*

Appellant also contends the trial court abused its discretion and violated his constitutional rights by denying his request to reopen his case so he could admit into evidence the gun he used in the shooting. Although the jury requested access to the gun during its deliberations, we do not believe the trial court erred in refusing to allow appellant to reopen his case.

As explained above, appellant testified the gun went off while he and Padilla were struggling for the weapon, and he did not intend to fire any of the shots. Based on this testimony, defense counsel argued the shooting was largely Padilla's fault because, by grabbing appellant's gun, she inadvertently caused the weapon to go off.

Anticipating this theory, the prosecutor called police officer and firearms expert Rocky Edwards as a witness at trial. Edwards testified he examined the .357 revolver that was recovered from Espinoza's vehicle after the shooting and determined it was in proper working order. He also determined the gun, which was marked as People's exhibit 54, has a trigger pressure of 9 pounds in the double-action position, and 3.64 pounds when in single-action mode. As Edwards explained, the gun also has a safety feature that prevents it from firing if something inadvertently hits the hammer or the trigger. He said, "There's only one way to fire this revolver, and that's to *pull* the trigger." (Italics added.)

During Edwards' testimony, he handled the gun while explaining all of its various features to the jury. However, the parties agreed that instead of admitting the gun

8

into evidence, the court would just admit a picture of the gun. Therefore, when Edwards finished his testimony, he took the gun back to the police department for safekeeping. And when it came time to admitting the People's exhibits, the parties stipulated that, for purposes of exhibit 54, the actual gun would be replaced with a photo of the weapon.

During deliberations, the jury sent the court a note that read, "We, the jury in the above entitled action request the following: Test gun trigger pressure; jurors would like to hold & feel the weight of the gun to test theories of defense. Would request lock taken off, /s/ Juror # 105, Foreperson."

In meeting with counsel to discuss the note, the court stated it would not be proper for the jury to "test" the gun because that would amount to creating new evidence. Defense counsel agreed with that, but he argued the jurors should be allowed to hold the gun so they could get a feel of the actual weapon that appellant used during the alleged offenses. He claimed this made sense because there had been testimony about trigger pull weights, Padilla grabbing the gun, and the possibility of "accidental discharges."

The prosecutor opposed letting the jury examine the gun. Since the gun was only used for demonstrative purposes during the trial, she argued it would be improper for the jury to attempt to recreate what either the expert or appellant did with the weapon. Indeed, she argued that allowing the jury to "conduct trigger pressure tests [with the gun] without any basis, and not being able to recreate exactly what happened, [would be] very dangerous."

During the hearing, the court also expressed concern about the procedural posture of the case. Since the gun was never admitted into evidence, and the jury had already begun deliberating, the court surmised a stipulation would be required to allow the defense to reopen its case and admit the gun into evidence. Defense counsel disagreed, claiming the court had the legal authority to allow a party to reopen its case at any time. However, in the end, the court simply did not feel comfortable doing that. After denying appellant's request to reopen, the court told the jury, "Before the

9

completion of the testimony in this case, both sides agreed that a picture [of People's Exhibit 54 would] be substituted for the actual weapon. The weapon itself was not made an exhibit and was returned to the police department. [¶] This means that the weapon is not available to the jury, and the court cannot comply with this request."

Generally speaking, a stipulation is not required to allow a party to reopen its case after jury deliberations have begun. Rather, "[t]he decision to reopen a criminal matter to permit the introduction of additional evidence is a matter left to the broad discretion of the trial court." (*People v. Jones* (2012) 54 Cal.4th 1, 66.) However, in this case, the issue was complicated by the fact the parties had previously stipulated the gun would *not* be introduced into evidence. A court cannot undo a stipulation simply because one party has become unsatisfied with its terms. "To do so 'strays from the judicial restraint essential to a rational judicial process.' [Citation.]" (*DVD Copy Control Assn., Inc. v. Kaleidescape, Inc.* (2009) 176 Cal.App.4th 697, 725.) Restraint is needed in this situation because the parties often rely on the effect of a stipulation in deciding how to put on their case. In this particular instance, it simply would not have been fair to the prosecution to reopen an issue that it reasonably believed was put to rest by virtue of the parties' agreement.

In any event, it is clear the trial court did not rely solely on the lack of a stipulation in denying appellant's request to reopen his case. Although the court did express some concern about that issue, it heard arguments and carefully assessed all of the pertinent circumstances in ruling on appellant's request. In particular, the court considered what restrictions apply when a jury is reviewing evidence during deliberations, whether the jury in this case might be inclined to use the gun to create new evidence, and whether, for practical and fairness reasons, it was simply too "late to . . . reopen the case" for purposes of introducing the gun into evidence. As to the fairness issue, even defense counsel acknowledged that when, as here, the parties enter into a

10

stipulation about how certain evidence is going to be treated, there are reasons for, and consequences that flow from, that decision.

Given everything that was said and discussed at the hearing on this issue, we are not persuaded to appellant's point of view the trial judge's focus on the lack of a second stipulation indicates he did not realize he had discretion in this regard. We are not convinced he thought he was somehow barred from weighing the request to re-open. Still, we must decide whether, in exercising its discretion to deny appellant's motion to reopen, the court abused its discretion by acting in an "arbitrary, capricious, or patently absurd manner that resulted in a miscarriage of justice." (*People v. Avitia* (2005) 127 Cal.App.4th 185, 193.) We think not.

"In determining whether a trial court has abused its discretion in denying a defense request to reopen, the reviewing court considers the following factors: '(1) the stage the proceedings had reached when the motion was made; (2) the defendant's diligence (or lack thereof) in presenting the new evidence; (3) the prospect that the jury would accord the new evidence undue emphasis; and (4) the significance of the evidence.'" (*People v. Jones* (2003) 30 Cal.4th 1084, 1110.)

Addressing these factors, appellant argues it is immaterial his request to reopen came at a late stage of the proceedings, because the relevancy of the gun did not become apparent until the jury asked to see it during deliberations. We disagree. How the gun went off was a central issue throughout the trial. That is why the prosecution called firearms expert Edwards to explain the characteristics of the gun and how much pressure it would take to pull the trigger. This testimony had obvious relevance to appellant's claim the gun went off accidentally while he and Padilla were struggling for the weapon. Yet, rather than seeking to have the gun admitted into evidence, defense counsel agreed that Edwards could take the gun with him after testifying and that a photo of the gun would suffice for evidentiary purposes. Because the significance of the gun was known during the trial, the timing and diligence factors support the trial court's

11

ruling. (Compare *People v. Monterroso* (2004) 34 Cal.4th 743, 779 [the denial of a request to reopen will be upheld if "the evidence the defense sought to offer at reopening was indisputably available *during* the trial"] with *People v. Frohner* (1976) 65 Cal.App.3d 94 [trial court erred in refusing request to reopen where evidence sought to be admitted was not available until jury deliberations had begun] and *People v. Newton* (1970) 8 Cal.App.3d 359, 383 [same].)

As for the significance of the gun and whether the jury would have given it undue emphasis, it is clear the weapon was an important piece of evidence in the case, in light of appellant's claims that he did not intentionally shoot anyone and that Padilla somehow caused the gun to go off. The jury obviously felt that handling the gun and testing its trigger pressure would help them assess the validity of those claims. However, there's always the potential for problems when jurors conduct their own experiments on evidence during deliberations. While jurors are free to critically examine evidence and use it "according to its nature" to help them decide disputed issues in the case, they are not free to conduct experiments that result in "the acquisition of new evidence[.]" (*People v. Collins* (2010) 49 Cal.4th 175, 243-244.)

In ruling on appellant's request to reopen, the trial court was rightfully worried the jury might use the gun to create new evidence. Even defense counsel acknowledged that was a legitimate concern, considering the jury wanted to "test" the gun's trigger pressure. At one point, the court did contemplate allowing the jurors to handle the gun and "pull the trigger a few times." But, as the prosecution noted, it would have been impossible for the jury to replicate the circumstances under which appellant fired the weapon, so there would have been little value in allowing the jury to do that. All things considered, we do not believe the trial court abused its discretion in denying appellant's request to reopen his case to admit the gun into evidence. Nor did the denial infringe appellant's constitutional right to a fair trial or to present a defense.

12

In any event, it would be pure speculation to presume appellant would have benefited from allowing the jury to examine the weapon. Appellant assumes the jurors would have been more inclined to accept his accident defense had they been allowed to handle his gun, but it is just as likely their examination of the weapon would have hurt his case. Suffice it to say, appellant has failed to show the requisite reasonable probability of prejudice as opposed to a mere possibility of harm. (*People v. Mena* (2012) 54 Cal.4th 146, 162; *People v. Watson* (1956) 46 Cal.2d 818, 836.) Considering as well there was overwhelming evidence appellant attempted to murder Espinoza in a premeditated fashion, we conclude any error in denying appellant's request to reopen his case to admit the gun was manifestly harmless.

## DISPOSITION

The judgment is affirmed.

BEDSWORTH, ACTING P. J.

WE CONCUR:


MOORE, J.


THOMPSON, J.

13